[Civ. No. 6235.   First Appellate District, Division One.—March 30, 1928.]

JOHN J. DONOVAN, Respondent, v. HIBERNIA SAV-INGS & LOAN SOCIETY (a Corporation), Defendant; W. J. HYNES, Administrator, etc., Appellant.

A. L. O'Grady, Cullinan & Hickey and W. T. Sweigert for Appellant.

Cleveland R. Wright for Respondent.

PARKER, J., *pro tem.*—This action involves a sum of money deposited with defendant bank by Edward O'Kane. The defendant Hibernia Savings & Loan Society, a corporation, admits holding the amount, but sets up the fact that there is a dispute as to the ownership thereof. The attitude of the bank is simply that of a stakeholder awaiting the final determination of ownership, and it avers its willingness to pay the money to whomsoever the court may award it. The real controversy is between plaintiff, who claims the

money by reason of a gift made to him by Edward O'Kane, and the defendant Hynes, the administrator of the estate of Edward O'Kane, who contends that no valid gift was ever made, and that O'Kane, never having parted with his title or right of ownership in and to the money, was the sole owner thereof at the time of his death, and that Hynes, as the administrator of the estate of said O'Kane, succeeds to the interest of the decedent for purposes of administration.

The case was tried by the court sitting with a jury, and the verdict of the jury being in favor of plaintiff, the judgment of the court was thereupon entered awarding the money in dispute pursuant to such verdict. Defendant Hynes prosecutes this appeal.

In the court below defendant produced no witnesses, and no evidence was introduced save and except that offered by plaintiff. It is appellant's contention here that, tested by the law and the decisions construing the same, and conceding to plaintiff the benefit of any conflict, nevertheless the case made out by plaintiff and the evidence in support thereof is insufficient to support the judgment. It therefore becomes necessary to detail the facts.

Edward O'Kane was a man of the age of seventy-five years at the time of the happening of the events hereinafter narrated. He was a single man, without family or relations living in this state, and, as far as the record discloses, had no relatives living elsewhere. His place of residence was a rooming-house conducted by the plaintiff Donovan. Donovan had known O'Kane for a period of sixteen years, and for the last nine years immediately preceding his death O'Kane had lived in rooming-houses conducted by Donovan, first on Howard Street, and for the last few years on Folsom Street, both in the city of San Francisco. On or about August 5, 1924, about 4:30 o'clock P. M., while walking down Howard Street, O'Kane was struck by an automobile and knocked down. The driver of the car stopped and picked O'Kane up and started with him to the Emergency Hospital. On the way O'Kane stated that he was feeling bad and would rather go to his home than the hospital. He directed the driver of the auto to his rooming-house, and upon arrival there he was able to get out of

the automobile and declined assistance in going into the house. He was bleeding from the mouth and was limping in his walk. O'Kane got up to his room and went to bed. On the next morning the clerk of the hotel, Patrick Devlin, saw him in bed and gave him such attention as was demanded, and upon the arrival of Donovan advised him of O'Kane's injury. Donovan thereupon went to the room of O'Kane and asked if he desired a doctor. O'Kane replied that the driver of the automobile had promised to send a doctor, and he then gave to Donovan the card which the driver had left, upon which card were the name and address of the driver. Efforts were made to get in touch with him, but to no avail. Finally it was learned that the driver's doctor was out of town. O'Kane then remained without medical attention all of the day of the 6th of August and until the day of the 7th. He stated that he felt "fairly well," though he declined food excepting a little coffee. On the morning of August 7th Donovan telephoned to Dr. Haderle requesting that he come. The doctor reached the place about 12 o'clock noon on that day. After examining O'Kane the doctor stated that in his opinion O'Kane had a fractured skull and should go to a hospital. He inquired then if there were any relatives. Donovan being present with the doctor and O'Kane, and the inquiry being addressed to him, replied that he did not know of any relatives, and suggested to the doctor that he ask O'Kane. The doctor did and O'Kane replied: "No, I have no relatives. I am the last of my generation. Mr. Donovan is my only friend." The doctor then stated to O'Kane, "You must go to a hospital, and as a physician I must know the address of your kin, if you have any; that is the duty of a physician," to which O'Kane repeated the former reply. The doctor, having advised the necessity of removal to a hospital, made further inquiry as to the financial ability of O'Kane. Learning that the old gentleman was able to afford the expense the doctor then prepared an informal document, roughly drawn on the back of an envelope and reading as follows: "Aug. 7, 1924.—To whom it may concern: I hereby authorize John Donovan to spend what money is necessary for all my expenses and promise to reimburse him. I further appoint him as my guardian and benefactor,

and give him full authority to act as my attorney in all matters until further notice. (signed) Edward O'Kane.— Witnesses, John J. Haderle, M. D., P. J. Devlin. Mother's maiden name, Ann McGuire.''

After this instrument was prepared and signed the doctor left the room, made arrangements for an ambulance and departed. After the doctor had gone O'Kane sent for Donovan and the latter returned to the room. With Donovan and O'Kane in the room, no one else being present, the gift is claimed to have been made. O'Kane said, ''Mr. Donovan, I must go to a hospital. Will you go with me?'' Donovan agreed. O'Kane then reached under his pillow and took his money belt and his bank-book, and he said: ''I fear I will not come back. These, my possessions, I give to you.'' Thereupon he handed to Donovan his bank-book and his money belt. O'Kane said, ''Here is my possessions. These are yours.'' Donovan took the belt and the book, and afterward placed both in his safe. The money belt contained $21, and the bank-book was the usual form of savings account, showing deposits to the credit of Edward O'Kane in the amount of $7,871.26, and issued by Hibernia Savings & Loan Society. About 2 o'clock P. M. of the same day an ambulance arrived, and O'Kane was removed from the house to the ambulance on a stretcher and taken to the hospital.

Nothing further of importance happened on that day. On the next day Donovan went to the Hibernia Bank and showed the document prepared by the doctor, and inquired if money could be drawn on that authority in order to pay O'Kane's hospital expenses. Mr. Ryder, an attorney at the bank, was consulted, and it was Ryder's opinion that the document presented was insufficient in form; and he suggested to Donovan that they go out to the hospital and see O'Kane. In the meantime Ryder prepared another document in the form of a general power of attorney running from O'Kane to Donovan. When Donovan and Ryder appeared at the hospital they were taken to the room or ward wherein O'Kane had been placed. Ryder introduced himself to O'Kane as representing the Hibernia Bank, and explained that he had a certain document which was a power of attorney running to John J. Donovan, wherein Donovan

was given power to draw money for the purpose of paying expenses or for any other purpose necessary. O'Kane attempted once or twice to talk, but the pain he was suffering at the time affected his power of speech. Ryder tried to get him to talk about the power of attorney and finally O'Kane after a struggle turned slightly on the bed— Donovan standing at the bedside—and O'Kane said, "I don't want to sign anything. I have already given (pointing to Donovan) him everything I have got." Ryder insisted that O'Kane should sign the paper, so after a time the paper was held up in front of him there, somebody got a book or something to hold it, and he attempted to sign it. The scrawl is visible on the document. Following O'Kane's attempt to sign Ryder asked him to sign by mark, explaining that it was necessary. O'Kane then made a mark, and Ryder signed the paper as a witness to the mark and left the room. The document thus signed was a general power of attorney to Donovan.

Ryder, thinking of the statement that O'Kane had made about his having given everything to Donovan, said to the latter after leaving O'Kane that apparently it was O'Kane's desire to make Donovan his beneficiary, and to that end it would be best to have a formal will prepared and executed. Then Donovan and Ryder returned to the sick room. It might be here noted that the room in which O'Kane was in bed was a small ward in which two other patients also had beds. Both Donovan and Ryder spoke to O'Kane about making a will. Ryder said: "Mr. O'Kane, you apparently want to give this man everything you have got; and in order that it should be put into proper legal shape you ought to make a will." O'Kane tried to mumble something, but was unable to talk. He did not move his head in assent or dissent. After two or three ineffectual attempts to get some expression from O'Kane, Ryder said to him: "Mr. O'Kane, I am judging from what you have said already that you would like to have a will made leaving what you have to Mr. Donovan. I will take it on myself to prepare a will and I will bring it out to you some time to-morrow, and I will bring along one of the other men from the bank, and at that time if you feel so disposed you can execute the will." Thereupon Donovan and Ryder left.

The next day Ryder and a notary took out a will for O'Kane to execute, but found him in such condition that nothing could be done. Nothing was said at that time by anyone. Within forty-eight hours O'Kane died.

During all of this time Donovan had said nothing to Ryder about the bank-book or about the belt having been given him.

After the death of O'Kane, to wit, on August 11, 1924, Donovan brought the package containing the bank-book to Mr. Ryder's office, and placing the book and the belt upon the desk, stated, "These are the old man's things." Here the matter rests until later in the month about August 29, 1924.

At that time a coroner's inquest into the facts surrounding the death of O'Kane was held. Donovan was called as a witness and gave testimony concerning the bank-book and effects of O'Kane. Referring to said book the following questions were asked of Donovan by the coroner, and the answers were given as follows:

"Q. What did he tell you to do with the package? A. He told me to keep it. Q. Keep it for him? A. No, he says, 'You keep this.' He did not say for him. He said, 'You keep this.' Q. In other words, it was left in your charge until he would come back from the hospital? A. Yes. Q. And at that time he did not think he was badly injured? A. Yes. Q. And he handed this to you as custodian? A. I suppose so. He threw out a request— Q. Never mind about that just at this moment. When he handed you this package your idea was you were to be custodian of it until he came back from the hospital? A. Yes. Q. He did not give it to you at the time with the idea that he presented it to you? A. Well, I don't know. He gave it to me. He said, 'This is yours. Keep it.' "

The foregoing in detail fully sets forth the facts surrounding the alleged gift.

As before indicated, there was no evidence adduced by defendant.

■ It is appellant's contention that the case made out by plaintiff was so badly broken down on cross-examination as to render it inherently improbable and unworthy of belief. Further, that the admitted facts and circumstances

in themselves negative the idea of a gift. Finally, appellant contends that if there ever was a gift the same had been revoked prior to the death of O'Kane.

■ It is well recognized that courts must scrutinize carefully the facts adduced to support the claim of a gift *causa mortis*. It is appreciated that abundant opportunity for fraud and wrongdoing is afforded in this class of cases. In the case of *Sullivan* v. *Shea,* 32 Cal. App. 369, 371 [162 Pac. 925], the rule is announced as follows: "Mindful of the facility with which, after the alleged donor is dead, fraudulent claims of ownership may be founded upon pretended gifts of his property asserted to have been made whilst he was living, it is but a salutary precaution which demands explicit and convincing evidence of every element needed to constitute a valid donation, whether it be a donation *inter vivos* or *mortis causa.* Even then fraudulent claims may prevail, but the rigid requirement of the clearest proof will at least diminish the number."

Adopting this as the law, nevertheless it does not follow that courts of review are to make an independent analysis of conflicting facts and retry the cause upon appeal. Appellant admits this to be true, and with this admission we feel the discussion is ended. An exacting cross-examination has developed inconsistencies and in some cases direct contradictions. However, the case in its entirety was submitted to a jury, and subsequently to the trial judge on motion for a new trial. The jury were painstakingly and fully instructed on all phases of the case, and this is most evident from the fact that not the slightest criticism is offered here on the action of the trial court in the matter of instructions. Every alleged inconsistency in plaintiff's case as it was developed was made the subject of an instruction, and all of the theories of appellant were presented carefully to the jury. The apparent contradictions in the testimony were argued and pointed out. In the face of it all the jury returned its verdict for plaintiff, and the trial court, with opportunity to note and weigh all of the facts and circumstances, and with further opportunity of observing the witnesses and their demeanor, refused to set aside the verdict rendered. The testimony of plaintiff was supported to some extent, and to a great extent, by that of a disinterested wit-

ness. It might further be noted that a great part of appellant's case was predicated upon conflicting and contradictory evidence given by plaintiff at the coroner's inquest. In this connection both plaintiff and the witness Ryder threw discredit upon the transcript of the testimony purporting to have been taken before the coroner, and the said transcript was not supported by any extrinsic evidence. It further appeared that at the coroner's proceeding some little feeling was developed between the plaintiff Donovan and the coroner, arising out of some previous matter entirely disconnected with the present case, and plaintiff testified in connection with the purported transcript of the coroner's inquest that his testimony was not, "put down right." The statement of plaintiff was, "To do me justice on that thing, the coroner was prejudiced against me. He accused me of being in his court on a scandalous case. I challenged him to prove it, and he brought his secretary out with the books, and the secretary says, 'No, Mr. Donovan was not here, your honor,' and the coroner never apologized to me."

The witness Ryder testified: "I remember having a pretty acrimonious passage at arms with the coroner at that time. I don't know that the report is absolutely correct. He may not have got it all down, I don't know. He may have gotten it down properly. I don't like the way it reads. I remember there was something in that testimony some place that was not altogether in accordance with what I had testified to down there." No evidence was offered to support the verity of the transcript read from as the official transcript of the proceedings at the coroner's inquest, and the force of the apparent contradictions was a matter exclusively for the jury. As to the inconsistencies developed elsewhere in the testimony at the trial in the court below, much the same situation exists, and these likewise left the truth to be determined by the jury with the supervisory control in the trial judge on motion for a new trial.

In passing it might also be noted that in explanation of some of his statements Donovan, the plaintiff, maintained all of the time that he did not consider the property actually his until such time as O'Kane had died. In other words, while contending that a gift had been made to him, he

nevertheless felt that the same was revocable and contingent upon the death of the donor. This is a correct conception of the law governing, and is the very gist of the whole transaction. A gift *causa mortis* remains, as it were, ambulatory to some extent as would a testament. Plaintiff's alleged statements that he understood that he was the custodian until O'Kane's return from the hospital are easily and readily reconcilable with this view.

■ Appellant contends that the writing prepared by the doctor, and being an informal power of attorney and appointment of guardian, controlled the alleged gift, and that the property was given to Donovan merely to enable him to secure funds to provide against the hospital and other expenses likely to arise. This necessarily goes to the question of intent, which was a question of fact for the jury (*Mellor* v. *Bank of Willows,* 173 Cal. 452 [160 Pac. 567]). There was before the jury the fact that O'Kane was without relatives and apparently without intimates; that Donovan had befriended him in some instances, at one time to the extent of saving his life. And, further, it appears that practically the last words spoken by this dying man were words confirmatory of the gift. After carefully scrutinizing the testimony adduced, we are not inclined to disturb the judgment on the ground that the case of plaintiff is in itself unworthy of belief.

We come now to the question of law argued. The entire controversy naturally centers around the law governing gifts *causa mortis.*

Section 1149 of the Civil Code defines a gift in view of death to be a gift which is made in contemplation, fear or peril of death, and with intent that it shall take effect only in case of the death of the giver. Section 1150 provides that a gift made during the last illness of the giver, or under circumstances which naturally impress him with an expectation of speedy death, is presumed to be a gift in view of death.

At the outset appellant contends that there was not present the fear or contemplation of death necessary to render a gift effectual.

■ The rule of law in the case of gifts *causa mortis* demands for their validity that the proof shall show the existence of a bodily disorder or of an illness which imperils

the donor's life and which eventually terminates it (*Zeller* v. *Jordan,* 105 Cal. 147 [38 Pac. 640]).

In the instant case O'Kane died within a few days after the gift, and his death resulted from the injury or ailment from which he was suffering at the time of the gift. He was an aged man whose expectancy of life was short, aside from any injury. He was told by the doctor that his condition was serious and that possibly his skull was fractured. He was ordered forthwith to a hospital for examination and treatment. His own statement was, "I fear I may not come back." While there is an attempt to show that he made general statements to the effect that he was "feeling fine" or "fairly well," yet there seems little question but that his condition was known to him to be serious. One may realize himself to be in peril of death and yet not expect to die. It may often happen that a sick or an injured person may believe that he has a greater chance to live than to die, but, nevertheless, will take every step anticipatory of death. This fear of impending death is not an essential element of a *causa mortis* gift. The section specifically predicates the gift on either contemplation of death or peril of death. Section 1150 raises the presumption that a gift such as here, made during the last illness of the donor, under circumstances which naturally impress him with an expectation of speedy death, is a gift in view of death. There was no evidence to rebut the presumption, but, on the contrary, all of the evidence supports it. The whole evidence leaves no uncertainty on the question. Further, as hereinafter set forth, this, too, became a question of fact for the jury, and under appropriate instructions the fact was determined. We find sufficient evidence to support it.

It is next contended that there was no delivery sufficient to constitute a gift of the funds in the bank as represented by the bank-book.

Section 1147 provides: "A verbal gift is not valid unless the means of obtaining possession and control of the thing are given, nor, if it is capable of delivery, unless there is an actual or symbolical delivery of the thing to the donee."

The pass-book or bank-book in question here contained in printed form a list of regulations classed as "Conditions on which deposits may be made with and will be

repaid by The Hibernia Savings and Loan Society, a corporation." Among these conditions appears the following: "On withdrawing any money, if the depositor is not personally present, the pass book must be accompanied by a written order or assignment from the depositor." Appellant, basing his contention upon this rule of the bank, argues that as there was no written order or assignment, the means of obtaining possession and control of the fund were not given, and therefore, conceding an attempt to make a gift, nevertheless the attempt was ineffectual and of no avail. Both sides here agree that the exact question has not yet been passed upon in this state. However, we feel that a solution is readily presented from the line of authorities on the general subject.

In the recent case of *Dellepiane* v. *Hynes*, 83 Cal. App. 604 [257 Pac. 180], the court discusses gifts of this character. The opinion is exhaustive and reviews many of the authorities. In that case it is said: "The great weight of authority is that the delivery of a pass book upon a savings account, with an intention of making a gift of the deposit represented by the book, is sufficient to pass title to the deposit without a written order or assignment." Indeed, appellant here concedes that to be the law of this state. The question as to whether or not the rule of the bank, requiring a written order for withdrawals, would have the effect of making a gift ineffectual without the order, was not before the court in the Dellepiane case, and therefore it was not passed upon.

In the case of *Ridden* v. *Thrall*, 125 N. Y. 572, 578 [21 Am. St. Rep. 758, 11 L. R. A. 684, 26 N. E. 627, 629], the question was squarely presented and passed upon, and the reasoning of the court was as follows: "The by-law requires an order when someone seeks to draw money for the depositor or the depositor's money. But the depositor can draw the money without making an order simply by the presentation of the deposit book, and so can any owner of the book. Suppose the plaintiff had purchased the book, and had thus become the absolute owner thereof, he could have drawn the money as owner on presentation of the book, and the bank could not have required as a condition of payment that he should procure a power of attorney or an

order from one having no interest, legal or equitable, in the deposit. The owner in such a case should produce satisfactory evidence of his ownership of the book; and if the bank refused to pay he would be obliged to establish such ownership by any competent evidence and nothing more; and his rights as purchaser would be no greater than his rights as donee. He has the same right to enforce a payment that he would have had if he had been the donee of any non-negotiable chose in action, or a certificate of deposit, or unindorsed note. He could establish his right to payment in such a case by any proof showing that he was the absolute legal or equitable owner.''

In *Dellepiane* v. *Hynes, supra,* the court, in commenting on the New York case, *Ridden* v. *Thrall,* says: ''The effect of the decision is that the pass book is in itself the evidence of the obligation of the bank, and that the question as to the ownership of the book was one to be determined by competent evidence, and that the donee of the pass book had the same right to enforce payment as the donee of any non-negotiable chose in action, certificate of deposit or unindorsed note. In such a case he may be called upon to prove his ownership, but this goes only to a question of title and not to the substantive right of the parties. Putting it in another way, if a party has come into possession of a pass book by purchase or gift, a written order or assignment would merely be evidence of the right and not the means of enforcing the right.''

That this is a correct interpretation of the decision is made manifest from a later New York case, *Scheffer* v. *Erie County Savings Bank,* 229 N. Y. 50 [127 N. E. 474]. From these decisions it can be deduced that the holding is that the requirement of a written order or assignment is not a limitation of the exercise of the power of assignment. To the same effect is the case of *In re Curran's Estate,* a New Jersey case reported in 3 N. J. Misc. Rep. 717 [129 Atl., at p. 820]. In an ancient case, *Tyrell's Estate,* 3 Pa. County Court 228, we find this language: ''In general compliance with rules of this character is necessary only for the purpose of establishing the relation between the corporation and the assignee, and so its compliance does not affect the validity of the transaction as between the original parties or persons

claiming under them. A gift *causa mortis,* in view of its conditional character, is one to which the doctrine would seem to be especially applicable. The delivery of a deposit book with the expressed intention of passing an ownership which is not to take effect indefeasibly until the death of the donor, manifests the purpose of the latter unequivocally, and in the only manner consistent with the nature of the gift, and against such manifestation his personal representatives, where the estate is free from debt, ought not to be permitted to set up as a reason for defeating a gift a regulation of the bank which does not concern them in any manner.''

In *Van Wagnen* v. *Bonnot,* 72 N. J. Eq. 154 [65 Atl. 244], it is said: ''The point was suggested, rather than insisted upon, by counsel that these savings bank books on their face required an assignment in writing by the depositor in order to transfer the money to another. This assignment relates to an absolute present assignment as between the bank and the depositor, and is only intended to regulate the legal rights of the bank with the depositor.''

The doctrine of the New York decision is followed, likewise, in *Goodson* v. *Liles,* an Alabama case reported in 209 Ala. 335 [96 South. 262].

Appellant has cited cases holding to the contrary, or, rather, cases wherein a contrary conclusion has been reached. However, upon analysis most of these cases will be found to be from jurisdictions where delivery of a pass-book is held insufficient to effectuate a gift of a savings account, and this irrespective of the question of the bank's requirements as to written order or assignment. These authorities, therefore, are of little aid here, inasmuch as it is conceded that the decisions of the state of California recognize as effectual to complete a gift *causa mortis* the delivery of a savings account pass-book, all other essentials being present (*Dellepiane* v. *Hynes, supra*).

The case of *Mellor* v. *Bank of Willows,* 173 Cal. 454, 461 [160 Pac. 567, 569], is directly in point on the question here being discussed. In that case the subject of the gift *causa mortis* was a number of certificate of deposit. The court says: ''The certificate of deposit was unindorsed. The appellants contend that this was a fatal defect to the validity of the gift. Where there is no opportunity to make

an endorsement or written assignment of an instrument, such as a certificate of deposit intended as a gift *causa mortis,* the absence of an endorsement does not raise a presumption against the validity of the transfer. The certificate was payable to self or order. Its delivery constituted an equitable assignment of the money on deposit. This clearly brings the case within the principle of the prevailing authorities that a gift of a deposit in a bank is a proper subject of a gift *causa mortis,* and may be evidenced by the delivery of the certificate of deposit without endorsement. *The conditions of transfer printed upon the certificate calling for an endorsement do not change the rule.''* And in support of this last statement the court cites the case of *Ridden* v. *Thrall, supra.*

Appellant here seeks comfort in the language of the Mellor case as quoted, namely, ''Where there is no opportunity to make an endorsement or written assignment,'' etc., and contends that this language is intended to provide only for exceptional cases. The whole opinion does not warrant this construction. Indeed, such a limitation would be unsound and would constitute an attempt to legislate rather than to construe. The clause was wholly gratuitous and has not the effect of a limitation. Many of the authorities are reviewed at length in an exhaustive annotation in 40 L. R. A. 1249, and the views hereinbefore expressed coincide with the almost unanimous holdings of other jurisdictions.

On principle, aside from authority, it seems manifest that no property right in money is lost by a deposit of the fund in a savings bank. The owner still retains all of his personal rights of transfer or assignment, and while the depositary bank may formulate and enforce certain rules relative to procedure and accounting, consistent with prudent management, yet the bank cannot in any sense restrict or take from the depositor any right of property. And it is elementary that the full right of property embraces the power of free disposition and control.

The appellant's claim here seems on its face to be unsupported. Appellant contends that by failure to give a written assignment the donor withheld the means of obtaining possession and control of the fund. The fact remains that the bank raises no question on this point. The

bank does not contend that there was no written assignment and therefore no gift. It simply denies, on information and belief, that plaintiff is the owner of the deposit. It alleges the claims of the parties to this controversy, and asserts that it has no interest in the fund in dispute other than to pay it to the person entitled thereto. In other words, it assumes the position of a mere stakeholder. And it is obvious that if it is held that a gift was made, the bank will not refuse payment. And it is further obvious that if defendant Hynes, administrator, should dismiss the action the bank would no longer defend but accede to the court's order. And throughout it all no question is presented by the depositary on the lack of a written assignment—showing conclusively that all that the bank requires is proof of ownership, and demonstrating the application of the New York holding to the effect that the written order or assignment is not an essential of the gift but only evidence thereof, and not indispensable evidence.

Appellant's next contention is stated as follows: "Even if there was a gift in view of death, it was revoked when the owner later reasserted dominion and control over his property by appointing the donee as his agent, under a power of attorney, to draw money from the Hibernia Bank."

■ It is a fundamental rule of law that a gift in view of death may be revoked by the giver at any time (Civ. Code, sec. 1151; *Daniel* v. *Smith,* 64 Cal. 346 [30 Pac. 575]; *Doran* v. *Doran,* 99 Cal. 311 [33 Pac. 929]). Without detailing the argument of appellant or attempting to distinguish the cases cited in support thereof we are of the opinion that revocation is a matter of intent. The intent to revoke is what accomplishes the revocation (13 Cal. Jur., pp. 45, 46). ■ Applying this doctrine to the facts of the instant case we may again note briefly the incident of the execution of the power of attorney. The witness Ryder testified: "O'Kane was very, very sick; he did not do any talking outside of one single sentence that was intelligible. He tried to speak, but it was obvious that the pain he was suffering affected his power of speech. I tried to make him answer me two or three times about the power of attorney, and, finally, after a struggle, he turned slightly on the bed—Mr. Donovan was standing by me—and he said 'I

don't want to sign anything. I have already given' (pointing to Donovan) 'him everything I have got.' But I insisted that he should sign this paper, so after a bit the paper was held up in front of him there, somebody got a book or something to hold it, and he attempted to sign it. The scrawl is visible on the document. Following his attempt to sign I asked him to sign by mark, and explained to him what was necessary. He then made a mark and I signed it as a witness and wrote his name on it.''

The power of attorney thus signed was a general power of attorney, and had therein no specific reference to the deposit or to the bank-book. There is nothing in the record to indicate any intention to revoke, but the facts and the statement of O'Kane tend to negative any such intent. Issue was joined on the question of revocation, and the verdict of the jury was against appellant's claim.

Throughout the entire presentation of this cause appellant insists upon what he classes as *indicia* of fraud, and points out many instances of equivocation. For instance, he emphasizes the silence of Donovan regarding the gift at times when it would be presumed he would have spoken. Yet Donovan makes reasonable and satisfactory explanation when he states that he understood the gift meant nothing if O'Kane recovered or chose to revoke, and he claimed no ownership in the fund until after O'Kane died. Appellant supports his argument by the repeated statement that gifts *causa mortis* are not favored by the law, and produces authority seemingly in support of this theory. But the statement is not exact. For many years, dating back perhaps centuries, the law has recognized gifts *causa mortis* and given effect to the manifest intent of the donor. It has appreciated the opportunities offered for fraud and injustice, and has tried to safeguard against the wrongdoer. One asserting a claim to property by virtue of such a gift has been put to the strictest proof, and from the outset looked upon perhaps with suspicion. But once the gift is proved the solicitude of the law in protecting the rights of each individual comes into play. And likewise, the intent of the donor being clearly shown, in accord with the requirements of the law the same regard for this intent is shown as in all other cases. In *Freese* v. *Odd Fellows Sav-*

*ings Bank,* 136 Cal. 664 [69 Pac. 494], we find this language of Chief Justice Beatty: "And when the trial court has rejected his testimony—necessarily upon the ground that it is incredible—it would be a startling innovation for this court to practically make an affirmative finding of a gift by reversing the decision of the trial court and remanding the cause." So, here, the facts were fully presented to a jury and to the trial judge, and a verdict returned in favor of plaintiff. The trial was without assigned error, and the law of the case and the various theories of each side fully presented to the jury and the learned trial judge. And it would be equally startling if this court were to make findings of fact upon the same evidence adverse to those of the court below.

Judgment affirmed.

Tyler, P. J., and Knight, J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 28, 1928.

All the Justices present concurred.