[S. F. No. 14676. In Bank.—June 1, 1933.]

JAMES LaMAR, Appellant, v. BANK OF AMERICA
NATIONAL TRUST AND SAVINGS ASSOCIATION
(a Banking Corporation), Defendant; RAYMOND B.
JOHNSON, as Administrator, etc., Intervener and Re-
spondent.

Will S. Robinson and Royle A. Carter for Appellant.

J. E. Rogers, A. F. Bray, Sylvester Andriano, William R. Lowery and W. L. Wollitz for Respondent.

SEAWELL, J. — Caterina Barbero, also known as Rina Barbero, died intestate at Richmond, county of Contra Costa, this state, on January 19, 1931. She was a widow, having been divorced from her former husband, and at the time of her death was, apparently, under middle age. She left no issue of her body. She was a native of Italy and left a father and mother, and other relatives surviving her, but none in this country. She visited her relatives in Italy less than two years before her death. At the time of her death she had on deposit with the savings department of the Columbus Branch of the Bank of America National Trust and Savings Association, formerly known as the Bank of Italy National Savings and Trust Association, at San Francisco, the sum of $11,153.88, and with the savings department of the North Beach Branch of the same corporation, at San Francisco, the sum of $11,736.74, totaling the sum of $22,890.62.

By proceedings had in the Superior Court of the County of Contra Costa, Raymond B. Johnson, public administrator, was appointed administrator of decedent's estate.

James LaMar, also known as Jim LaMar, claiming that the decedent had made gifts *causa mortis* of said savings accounts to him three days prior to her death, demanded of said branch banks that they deliver to him the respective amounts so deposited in the name of Caterina Barbero. Appellant not being able to accompany his demand with any authorization for payment of said accounts or deposits to him, except the presentation of the two deposit or pass books issued by the branch banks to Caterina Barbero, they refused to acknowledge appellant as the owner of or entitled to receive said deposits. He thereupon commenced suit in the superior court to compel the payment of the deposits to himself.

The administrator of the Caterina Barbero estate intervened and alleged that no valid gifts had been made by decedent to appellant; that undue influence had been ex-

erted by appellant upon the decedent to obtain a manual delivery of said bank books to him; that said alleged donor was mentally incompetent by reason of the dosages of morphine and other drugs administered to relieve her from pain and prevent convulsions, and, also, by reason of a disordered and oedemic condition of the brain which usually attends the disease from which decedent was suffering in its terminal stages. That she was rapidly passing into a state of coma at the time the alleged gifts were made, from which she did not thereafter rally, admits of no serious doubt.

Defendant bank asserted no right or claim to said savings account deposits other than as depositary.

The case was tried by the court without the aid of a jury. The court found that it was untrue that said alleged gift of said two savings accounts or deposits, or either, was made by decedent in contemplation of approaching death and that she did not intend or desire to make a gift thereof to plaintiff; that plaintiff came into possession of said savings deposit or pass books by and through undue influence exercised by him upon decedent at a time when she had become mentally and physically weakened by a long period of serious illness, aided by a confidential relation which existed between appellant and decedent; that at the time appellant came into the possession of said savings account or passbooks decedent was entirely without understanding and was unable to appreciate the importance or effect of the transaction by which appellant asserts the delivery and the passing of title to him of said funds in the manner herein related by him and his two principal witnesses. Judgment went accordingly for the intervener, and plaintiff has taken this appeal.

It is well settled that a finding supported by evidence in favor of respondent upon any one of the above material issues, as, for example, a finding of want of mental capacity to make a valid gift, renders other issues affecting that question immaterial. (*Sherman* v. *Sandell,* 106 Cal. 373 [39 Pac. 797, 798].) It will be sufficient therefore to consider the alleged incapacity of the decedent to appreciate or understand the nature or effect of the act by which appellant claims to be entitled to receive and enjoy said savings deposits as gifts *causa mortis.* We are of the view that intervener's claims as to the mental incompetency of the

decedent are fully sustained, and we will not therefore devote extended consideration to other issues going to the validity of the transaction.

We may in the outset repeat what was said in *Sherman* v. *Sandell, supra,* and which has been repeated hundreds of times since:

"This issue is purely one of fact and is to be determined by the trial court, and to the extent that its determination rests upon the mere preponderance of evidence, or upon the consideration of conflicting or contradictory evidence, the findings of the trial court are not open to review in this court. (*Brison* v. *Brison,* 90 Cal. 334 [27 Pac. 186].)" (See, also, *Coyle* v. *Coyle,* 212 Cal. 715 [300 Pac. 5].)

██ The rule that the findings of the trial court must be construed to support the judgment, if it is reasonably possible to do so, is so familiar to the practice as not to require any citation of authority to support it.

██ The record furnishes practically no information as to the personal history of the principals or witnesses. Jim or James LaMar, it appears, was not of Italian blood, but he spoke the language. Neither his age, place of birth, antecedents nor occupation is given. It does not appear whether he was a married man, single or a widower, or that he was eligible to marry. He alleged in his complaint and testified to meretricious relations having existed between himself and Caterina Barbero for a period of eighteen months prior to her death. By their few acquaintances residing in the neighborhood in which decedent's home was located she and appellant were presumed to be husband and wife. He testified that he came to her home four or five nights a week. The decedent, it appears, fell ill about December 20, 1930. She did not leave her bed for any appreciable period thereafter. Appellant and Mrs. Mary DeGeorgis, an Italian friend and neighbor, attended her during her illness. Her condition grew gradually worse and on January 4, 1931, Dr. William E. Cunningham, a practicing physician of Richmond, was called to attend her. He diagnosed her condition as acute Bright's disease and found her to be desperately ill. He visited her three times daily. She was taken by ambulance to the hospital on January 17, 1931, in a state of semi-coma. The attending physician had upon several occasions insisted that she should go to the hospital, but she

did not give her consent to the removal until the third day preceding her death. Upon her first visit he found her to be suffering great pain which required opiates throughout the day to quiet her.

On the morning of January 16th, the day on which the gifts are alleged to have been made, the doctor found the muscles of her body twitching, which is a symptom of uremia and indicative of convulsions or coma. These symptoms usually mark the terminal stage of the patient's life. He administered hypodermically a half grain of morphine and one-hundredth of a grain of hyoscine to quiet the patient, who was very restless. The patient was then apathetic due to toxemia, and her mind was not clear. The doctor visited her again at noon and she was very low and growing rapidly worse. He repeated the hypodermics in the same quantities as were given on the morning visit. The doctor again visited her between 6 and 7 o'clock P. M. of the same day. He urged upon appellant the necessity of taking the patient to a hospital. Her condition was worse than it was in the morning. She was not definitely delirious at that immediate moment, but she was bordering on delirium and was in a restless stage, tossing about and moaning, which usually terminates in delirium. Her mind was not clear. She could answer questions as to suffering pain, but it was the doctor's opinion that she was not capable of understanding or transacting ordinary business. She was suffering great pain and the drugs were administered for the stupefying effect they have upon the brain. The same quantity of morphine and hyoscine were again administered and about one-half hour thereafter, at the time when the opiates should have their deepest effect upon the senses, the alleged gifts were made and the words of donation which are necessary to the validity of a gift are alleged by appellant to have been spoken.

The deceased was taken to the hospital on the following morning in a state of semi-coma and never rallied from halmaturic nephritis and bled freely from both extremities, as shown by the nurse's chart. She was seized with convulsions and suffered from delirium, the usual symptoms of the terminal stages of Bright's disease. The attending physician, who saw the patient three times a day over a period of fifteen days, testified that the brain cells must have been oedemic—dropsical—on January 16, 1931, and in his opinion

she was not competent to make a transfer of her property by gift, or to have rationally performed any other business act. Her condition was too advanced to admit of lucid intervals.

Dr. A. W. Hebert, with World War experience in the use of morphine and hyoscine, was called as an expert witness and in answer to a hypothetical question framed upon the condition of decedent on January 16, 1931, including the administration of the opiates and the progressive symptoms of the disease with which decedent was suffering to the time of her death, stated that in his opinion decedent was not able to understand or carry in her mind the nature of her property and the relation in which she stood to the objects of her bounty, free from all delusions or effect of said disease. He was of the opinion that she could not have understood, nor could she have concentrated her mind upon or appreciated the nature or effect of the alleged gift transaction.

Appellant testified that his relations with the decedent were that of husband and wife. This relationship had existed for a period of two years and they intended to enter into the state of marriage in March, 1933. He informed no one of their engagement to marry, which was entered into some six months before Caterina Barbero died. Nothing had been said about marriage during the last few months of their relationship. The home place stood in the name of the decedent, who had built a new house upon the lot purchased by her several months before her death. Appellant, it would seem, made some kind of a claim, or was threatening to make a claim, against the estate in the sum of approximately $2,500 which, after the death of the decedent, he claimed to have put into the new home. No written evidence of his interest in said property was produced.

We now turn to the testimony upon which appellant relies for a reversal of the judgment, which is in conflict with the evidence upon which the trial court based its judgment.

LaMar testified that at about the hour of 6 o'clock on the evening of January 16, 1931, he was at the side of decedent when Mrs. DeGeorgis, who was assisting him in nursing decedent, and her son Pete, entered the room. The doctor had then departed. Mrs. DeGeorgis asked her how she felt and she replied that she felt better, but a little bit tired.

She then "took a sick spell". She told Pete she had to go to a hospital and all present agreed that it would be better for her to receive hospital care. When she had this sick spell she said to appellant, "Jim, I think I am a goner, I will have to go to the hospital," and "I am afraid that I do not come back. In the top drawer of the bureau is where I keep all my things. In my purse there is two bank books, and the keys to the safe deposit box. Get it, I want to give them to you. You have been treating me all right and I know you will do the right thing by my folks and I want you to have everything." He went to the drawer and took out the bank books and key to the safe deposit box and said to her: "This is what you want to give me?" She said, "Yes, yes, you can take those, those are for you, and everything they contain." "I [appellant] started to help her up—I says, 'Don't worry . . . you are not going to die, we want to help you.' And I held her up and tried to comfort her as much as I could, and I took the bank books and put them in my pocket and kept them ever since." On cross-examination he amplified his testimony slightly. He testified that she felt she was pretty sick and thought she was "going". She said she was going to the hospital and she might never come back. He assured her that she was not going to die. She then instructed him to take the bank books. He went to the bureau drawer, took them out, showed them to her and asked her if they were what she meant him to have. She replied, "Yes, they are for you. You have treated me all right and I know you will do the right thing by my folks. I want you to have everything, you can help them out."

Mrs. DeGeorgis, called as a corroborative witness by appellant, testified that Caterina Barbero protested against going to the hospital, stating that if she went she would never come back. She testified substantially as LaMar did except she said that LaMar placed the books and key in decedent's hands and she handed them back to him. "LaMar said to her, 'You are glad to give this to me?' And Rina Barbero say, 'Yes, because you do the best you can do for me.'" LaMar then took the books and put them in his pocket and assured her that she would come back from the hospital well. This witness said that nothing was said by decedent about appellant taking care of decedent's folks. She made no

such request. Upon cross-examination Mrs. DeGeorgis identified the color of the bank books as dark brown, when as a matter of fact they were of a light yellow.

The testimony of Pete DeGeorgis was substantially identical with that of LaMar and Mrs. DeGeorgis as to the delivery of the bank books and the accompanying words of donation. No other persons were present. The following morning the decedent was taken to the hospital in a semi-comatose state, where she grew progressively worse. When she arrived at the hospital she had passed answering questions and no doubt was entering the stage of coma.

As stated in the beginning, this case is purely one of fact and its determination rests upon conflicting and contradictory evidence. The trial court in weighing the physical and mental state which the decedent unquestionably was in on January 16th undoubtedly discredited the testimony of the three witnesses which, if credited, would have been sufficient to have established a lucid interval in her generally clouded mental condition and brought about a different judgment. It may be that the close adherence of said three witnesses as to the exact language used by the parties in relating the delivery of the bank books and the meticulous order in which events were described and the timely acts of the sick woman in complying with the statutory requirements necessary to constitute a gift *causa mortis,* a procedure with which the best informed laymen are not usually familiar, had a legitimate influence upon the court's mind in arriving at its conclusions. The fact that the attending physician testified that the appellant called upon him a few days after the death of the decedent and complained that he had not given him timely warning that decedent was approaching death, to the end that property matters might have been attended to, would at least create some doubt as to whether the claim of ownership by gift was not an afterthought. Certainly it is the duty of the trial court to scrutinize the evidence offered to establish gifts *causa mortis* in the circumstances shown by the record in the instant case with great care.

There was no evidence in the case except such as came from the three witnesses who gave testimony as to what transpired at the time the bank books are alleged to have changed hands, that the decedent ever thought she was going

to die. The attending physician never told her that she was in a critical condition and surely the appellant, as evidenced by his subsequent exhibition of displeasure at the physician because of his failure to notify him of decedent's serious condition, did not inform her that she was suffering from an incurable malady. The court found that she did not deliver said bank books prompted by a sense of impending death. This finding cannot be disturbed by us.

We are of the view that the court's finding as to a want of mental capacity of the decedent to make the gifts in question is decisive of the case and is sustained by the evidence. This being so, all other issues bearing on the validity of the gifts are rendered immaterial.

The judgment is affirmed.

Thompson, J., Shenk, J., Curtis, J., Preston, J., and Waste, C. J., concurred.