[L. A. No. 16228.   In Bank.—May 31, 1939.]

EDITH M. GORDON, as Executrix, etc., Appellant, v. MARY ROBB BARR, Respondent.

J. E. Hood and Conley, Conley & Conley for Appellant.

Samuel F. Hollins, Matt Wahrhaftig and McKee, Tasheira & Wahrhaftig for Respondent.

EDMONDS, J.—The question presented for decision in this case is whether Julia A. Gordon in her lifetime made a valid and completed gift of certain property to W. M. Barr, who was the respondent's father. The appellant, as executrix of the will of Mrs. Gordon, brought an action to quiet title to this property. She also sought an accounting for its use and a reconveyance. The superior court determined that title to the property had passed to the respondent by the gift to her father and his subsequent transfer of it and rendered judgment accordingly.

The evidence shows that Mrs. Gordon and Mr. Barr were first cousins and intimate friends. She lived in Oakland and he in Fresno County, and for many years he managed the investment of $2,000 which she had entrusted to him for that purpose. With it he had purchased notes secured by mortgages on real property in Fresno County, the interest on which he remitted to her regularly for many years. Numerous letters which they exchanged during this period, and which were received in evidence, show an unequivocal desire on her part that the property should eventually belong to him but that she receive the income from it during her lifetime. Whether this purpose ripened into a completed gift of the property to him during her lifetime is the precise point in dispute.

Originally the notes were taken in Barr's name and the documents of title were retained by him in his safe, together with an assignment in blank and a statement that the property belonged to Julia A. Gordon. In 1928 this practice was changed. During that year the original loan was paid off and two new loans of $1,000 each were made. One, which will be referred to as the Deaver mortgage, was made payable

to Julia A. Gordon and was forwarded to her. The other, known as the Stewart mortgage, was taken in Barr's name.

About this time Mrs. Gordon wrote him concerning a plan, which she said was suggested by her attorney. Under it, she said, "you will get the two mortgages of $1,000 each at my death, which I want to know will go to you without fail". According to this plan she was to execute assignments of the notes and mortgages to him and place the assignments in her safe deposit box to be delivered to him at her death, and it was to be "understood that these assignments are not to take effect until my death". Mr. Barr's reply to this is not in evidence, but it may be inferred that he questioned the validity of such procedure, for in a subsequent letter to him Mrs. Gordon stated that she wanted to show his letter to her attorney, but had not been able to see him yet and that "All I care, Cousin Will, is to be sure that these mortgages come to you and to whom you want to have them after you and I are through with them."

Early in 1929 the parties were evidently still in disagreement as to the way Mrs. Gordon's wishes should be carried out, for at that time Mr. Barr wrote to her saying "Neither myself or my attorney agree with yours, quite. I think that he will agree with us that under present conditions you will have a perfect right to do what you please with your property but I want to arrange this matter as you want it." The matter was still undetermined in June of that year when she wrote to him: "I had arranged in good shape everything five years ago and I thought when I had told you by word of mouth that I gave you those mortgages after I am gone that that was all that was necessary to complete the business. But it seems it is not legal, so all this red tape has to be gone through with. Of course, a lawyer wants things done in legal and proper form. Personally I don't care, only I want to be sure that the proceeds of these mortgages go to you, and after that to cousin Mary."

In October, 1929, Stewart was in default on his note and in lieu of foreclosure he agreed to convey the property to Barr and his wife (whom Mrs. Gordon called Cousin Mary), "subject to a mortgage of one thousand (dollars) to Julia A. Gordon which the grantees herein assume and agree to pay" and at the same time he executed a new note and mortgage in favor of Julia A. Gordon. Barr forwarded the note

and mortgage to her, together with a blank assignment, and she had possession of both mortgages from that time until her death. However, a few days later she returned the executed assignment of the mortgage to him, saying "I am sending you my assignment of mortgage and if you wish the rest of the papers I'll send them". In a letter acknowledging receipt of this document he said, "I did not expect you to return the assignment to me. You see if I should record it now, it would put the mortgage back in my name and you would have no more to do with it. Unless you would rather hold it with the other papers I will hold it as it is, not recording it. It is not effective until it is recorded."

A few months later Mrs. Gordon executed and forwarded to Mr. Barr an assignment of the Deaver note and mortgage, and in March, 1930, he wrote to her saying: "I have not recorded the last assignment you sent me but will await developments." This assignment was recorded the following month and the assignment of the Stewart mortgage was recorded in January, 1931. Later in 1930, he wrote to her again, saying, "Do you want to sell the Stewart house or take a $500 payment on the Deaver house. I think we could do one or the other soon."

In 1931 the health of both parties had failed to such an extent that they ceased corresponding. Mr. Barr assigned the Deaver note to his daughter, the respondent in this case, and he and his wife also conveyed the Stewart property to her. The daughter continued to pay the income from the property to Julia A. Gordon until her death in 1934. Prior to that time the Deaver note was paid off, and Miss Barr reinvested the funds, taking a new mortgage to secure a note payable directly to herself. Concerning this she wrote to Julia Gordon: "On a separate sheet I am enclosing a statement of your loan and interest as near as I can figure it out. Tony [respondent's brother-in-law] has loaned the $1000 again."

At the trial Miss Barr testified that it was her understanding that Mrs. Gordon gave the property to her father, reserving only the income during her life and that her father considered the money a gift. Her brother-in-law testified to the same effect. However, in evidence are letters written by him following the death of Mr. Barr in which he refers to the funds as "Cousin Julia's money" and states "We have

several letters from Cousin Julia to Mr. Barr stating that when she passed away the principal of the investment should go to Mr. and Mrs. Barr. It was an act of fate that both Mr. and Mrs. Barr have preceded Cousin Julia in death, and this fact has necessarily complicated the matter to a great extent.''

Upon this evidence the trial court found that the two notes and mortgages which Julia Gordon executed and delivered to W. M. Barr ''were not, nor was either of them, delivered upon any condition whatsoever, except that said assignments were, and each of them was, delivered upon the express understanding and agreement that the said W. M. Barr·should manage and control the funds invested in said mortgages, subject to the direction of the said Julia Gordon, during her lifetime, paying the income therefrom to the said Julia A. Gordon, for and during the term of her natural life, and that upon the death of said Julia A. Gordon, the said funds, property and indebtedness, and all the proceeds thereof, should be and remain the property of the said W. M. Barr, his heirs and assigns, free and clear of any trust or obligation whatsoever''. The court also found that W. M. Barr had transferred the notes, mortgages and land derived therefrom to the defendant in consideration of more than $4,000 advanced by her to him and concluded that defendant was the owner of the land· and the note in question.

▊ The appellant argues first that the judgment of the trial court is contrary to its findings. Specifically, it is claimed that the finding that the assignments were delivered upon the understanding ''that upon the death of said Julia A. Gordon, the said funds, property and indebtedness, and all the proceeds thereof, should be and remain the property of the said W. M. Barr, his heirs and assigns, free and clear of any trust or obligation whatsoever'' compels the conclusion that the parties intended that the gift should not take effect until Mrs. Gordon's death, and hence the delivery was ineffectual. But appellant's interpretation is piecemeal; she seizes upon one portion of the finding and ignores its context. This part of the findings does not mean that title should vest in Mr. Barr only upon Julia Gordon's death; it is entirely susceptible of the interpretation that upon the death of Julia Gordon the funds should be ''free and clear of any trust or obligation whatsoever'' and it should be con-

strued in that way to support the judgment. (*Merner Lumber Co.* v. *Brown,* 218 Cal. 136, 139 [21 Pac. (2d) 590]; *La Mar* v. *Bank of America Nat. T. & S. Assn.,* 218 Cal. 252, 256 [22 Pac. (2d) 689].)

A further contention of the appellant is that the finding indicates that Mrs. Gordon did not part with the right of dominion over the property because the delivery was conditional; that is, it was made on the condition that Mr. Barr manage the investment subject to her direction and subject also to her right to the income during her life. This presents a more difficult question.

The necessity for delivery in gifts of personal property has its genesis in the archaic doctrine of seisin. (Brown on Personal Property, p. 76; 20 Col. L. R. 196; 21 Ill. L. R. 341.) But in spite of the formalistic character of its origin, the requirement has salutary features which fully justify its retention in the law. It protects the property of the individual from ill-founded and fraudulent claims of gift by requiring strong concrete evidence that he really intended to part with his property. Such a precaution is especially desirable when, as is frequently the case, the alleged donor is dead at the time the claim is asserted. Moreover, by requiring some positive act of relinquishment such as manual tradition of the subject of the gift, the significance of the donor's act is forcefully brought home to him, and he is thus protected from ill-considered or impulsive donations of his property. (See Mechem, The Requirement of Delivery in Gifts of Chattels, 21 Ill. L. Rev. 341, 457, 568, at 348 et seq.)

In the light of these desiderata such vague terms as "constructive delivery", "symbolic delivery", and "parting with dominion and control" take on a new aspect and become more certain and explainable. Where there has been unequivocal proof of a deliberate and well-considered donative intent on the part of the donor, many courts have been inclined to overlook the technical requirements and to hold that a "constructive" or "symbolic" delivery is sufficient to vest title in the donee. However, where this is allowed the evidence must clearly show an intention to part presently with some substantial attribute of ownership.

The California decisions often speak in terms of "absolute and unconditional delivery" and "transfer of complete dominion and control" (see *Beebe* v. *Coffin,* 153 Cal. 174 [94

Pac. 766]; *Knight* v. *Tripp,* 121 Cal. 674 [54 Pac. 267]), and yet a study of them shows that these terms are used only in a limited sense. As long as the donor's acts unequivocally show that he intended to divest himself of ownership in the property, the gift will be upheld. Thus, it has long been established that a donor may make a valid gift of property reserving to himself a life interest in, or a life income from, the property given. (*Calkins* v. *Equitable B. & L. Assn.,* 126 Cal. 531 [59 Pac. 30]; *Mercantile Trust Co.* v. *Reay,* 96 Cal. App. 568 [274 Pac. 401].) And it has been held that a gift of corporate stock is not invalidated even though given subject to the donor's right to vote the stock and collect the dividends. (*Lynch* v. *Lynch,* 124 Cal. App. 454 [12 Pac. (2d) 741].)

Moreover, it has frequently been held that gifts in trust in which the donor reserves the right to revoke the trust are not invalid. (*Booth* v. *Oakland Bank of Savings,* 122 Cal. 19 [54 Pac. 370]; *Drinkhouse* v. *German S. & L. Soc.,* 17 Cal. App. 162 [118 Pac. 953]; *Nichols* v. *Emery,* 109 Cal. 323, 331 [41 Pac. 1089, 50 Am. St. Rep. 43]; *Tennant* v. *Tennant Mem. Home,* 167 Cal. 570, 576 [140 Pac. 242]; *American Bible Soc.* v. *Mortgage Guar. Co.,* 217 Cal. 9 [17 Pac. (2d) 105].) In the last case cited the donor attempted to make a gift by creating a revocable joint tenancy with right of survivorship in the donee. The gift was technically defective because the donee was a corporation, but the court gave effect to the donor's intention by holding that a valid trust in favor of the donee had been created.

Under the law as established by these cases the court's finding to the effect that Julia Gordon reserved a right to the income from the property during her life and the right to a voice in its management is not contrary to the conclusion that the gift was complete and valid. Upon principle, the situation of the parties as stated in this finding cannot be distinguished from the facts upon which the case of *Lynch* v. *Lynch, supra,* was decided.

Appellant also contends that the evidence shows that the donor intended that the gift take effect only upon her death and, therefore, does not support the judgment. It must be conceded that several of the letters written by Julia Gordon during the years 1928 and 1929 show an intent on her part to retain title to the notes and mortgages until her

death, and the plan suggested by her attorney whereby she was to execute but retain the assignments during her lifetime would doubtless have been ineffectual. But that plan was not followed. Instead she executed and forwarded assignments of both mortgages to W. M. Barr at Fresno. One letter of transmittal is in evidence and it contains no conditions or restrictions whatsoever. No claim is made that the notes which she retained were of such character as to enable her to pass a good title notwithstanding the assignments, and it must, therefore, be assumed that the delivery and recordation of the assignments unqualifiedly divested the donor of title. Title having vested in W. M. Barr, the fact that he predeceased Julia Gordon cannot affect the respondent's rights.

██ Nor is it material that neither the respondent nor her brother-in-law made any active assertions of completed gift prior to the death of Julia Gordon. This evidence bore, to some extent, upon the credibility of the direct testimony of these two persons, but the trial judge chose to credit their statements. There is substantial evidence to support the judgment in favor of the respondent and it should, therefore, be upheld.

The judgment is affirmed.

Curtis, J., Seawell, J., Houser, J., Langdon, J., and Shenk, J., concurred.