Alexander Del Giorno, J.
This is a claim to recover damages for the wrongful death of decedent and for conscious pain and suffering, both alleged to have been caused by the negligence of the State, and for trespass on claimant’s property and for loss of services.
On October 7, 1958, at about 8:25 a.m., the State police at the Latham station received a telephone call from the Lane Construction Company, who were the contractors on a portion of the North way, concerning broken windshields in some cars belonging to employees. Trooper Joseph E. Garrett, Jr., assigned to the matter, proceeded to the construction shack of the company and interviewed two complainants and discovered that large stones had been thrown through the center of the windshields of two automobiles. He went to the Titcomb residence, about 150 feet from the scene, which was the last one remaining in that immediate area. At the time demolition work was proceeding along the North way. The Titcombs had been given a few extra days before vacating their house which had been appropriated. At about 9:00 a.m;., Trooper Garrett interviewed Etta Titcomb, mother of the deceased, and her son Norman. Garrett’s testimony indicated that while Norman denied knowing anything about the broken windshields, he did state it was possible his brother Marvin, the deceased, may have had something to do with it. "When Garrett asked that Marvin come out of the house to talk to him, Mrs. Titcomb went into the house, then came out and said that Marvin was in his room and would not come out. The trooper was then on the back porch. Norman then went into the house, emerging with the same report.
With the consent of the Titcombs, Garrett followed them into the house. Going to the outside of Marvin’s room, which was just off the kitchen, he knocked on the door, identified himself as a trooper and stated that he wanted merely to talk to Marvin about the windshields. Marvin replied that he was not coming out. They all attempted to coax Marvin to come out, to no avail. Garrett then went back to the cars where the two complainants were waiting, and explained the situation. Within 10 minutes he returned to the house. In response to his questions, the mother and brother stated that Marvin had been upset over the loss of their home due to the construction of the Northway and the loss of a newspaper delivery route he had maintained for *904 years. ITe had been locking himself in his room for hours at a time, refusing to shave or have a haircut and keeping entirely to himself. Upon inquiry they told Garrett that Marvin had not been examined by a doctor; their family doctor had retired. Garrett in furtherance of his sympathy suggested to them that, if they wished, he would get Dr. McCullough, the Town Health Officer, and have Marvin examined. He explained that if Marvin were to be committed, either one would have to sign him into the psychiatric ward. Garrett testified that they consented to examination by the Town Health Officer and to his commitment. Garrett then asked Norman if there were any guns in the house. The latter said there was a gun which was his and was in his room. Garrett asked him to get it and put it away.
Garrett then returned to the station house, and was advised by Sergeant Sayers to call Dr. McCullough. At 11:10 a.m. he called the doctor, who was out at the time. At about 11:30 a.m., the doctor returned the call and agreed to meet the trooper at 12:30 p.m. with the Boght Community Rescue Squad. At about 12:30 p.m., Garrett returned to the Titcomb residence accompanied by Trooper Keating, where they found the doctor, and the ambulance which had arrived at about 12:15 p.m. Garrett was told by Norman that he had found his own gun and locked it in his car. According to Garrett, Norman said there might be another gun but he was neither sure there was another nor where it might be.
Troopers Garrett and Keating talked with Dr. McCullough and members of the rescue squad about the prevailing situation, outside the house, and all then discussed it with Norman. They then went into the house with Norman, where they assured Marvin through the door .that they wanted to help, not harm him. No answer was forthcoming. Since the door was locked, it was agreed by all, including Norman, that the only way to remove Marvin would be to break the lock. Keating then broke the lock, and the door opened five or six inches. They were unable to see anything in the room because it was dark. The door was then slammed shut from within. Further pleading to come out proving fruitless, Keating and Garrett put their shoulders to the door, forcing it another five or six inches, at which time a bumper jack allegedly was thrown by Marvin through the door, just missing Garrett and going through Keating’s legs. They pushed the door again, and then a hammer was hurled through the door by Marvin, skimming over the top of Garrett’s head. Then the door was opened again for a few inches, and a chair crashed against it, parts of it going through the door. There was a barricade placed against the door inside *905 the room, which the troopers alleged they were unable to displace.
During a subsequent conference, Trooper Keating suggested in the presence of Norman the use of tear gas to rout Marvin from the room, assuring Norman that it was not toxic and would not harm Marvin. Keating stated that it was evident that this family were under a severe emotional strain and for that reason the troopers explained fully to the family every step they wanted to take to alleviate their anxiety, Keating phoned the troopers’ station and asked that tear gas be obtained and that the lieutenant come to the scene. Garrett estimated the time consumed in the operation of pleading with Marvin and explaining to the family to have been about 45 minutes. As a result of the call, Lieutenant Dwyer came to the scene with Sergeant Sayers about 1:30 p.m., just after Trooper Fenelon arrived. At about the same time, Trooper Salerno and Corporal Cox arrived with a canister of tear gas known as No. 112, Federal Spedeheat Grenade. Lieutenant Dwyer, Trooper Keating, Norman and Mrs. Titcomb conferred for about 15 or 20 minutes concerning the use of tear gas. At about 1:45 p.m., Garrett knocked the upper panel out of the door and Keating dropped in the canister. Before the canister was thrown in, Garrett, Keating and one of the ambulance attendants had moved the kitchen table away from the center of the floor and had received permission from Norman to take the kitchen door off its hinges. The door was taken off, and Norman took it to the cellar. Upon the order of Lieutenant Dwyer all of the troopers’ guns were removed, with the exception of that of Corporal Cox. It was explained that all this was done in their anticipation of the violent rushing out of Marvin to escape the suffocating effect of the gas.
One or two minutes after the grenade had been thrown into the room, someone yelled that Marvin had the bedroom window open. Fenelon stayed in the kitchen, Garrett went outside to see if Marvin might be trying to get out and Corporal Cox, in civilian clothes, was standing on an object by the window sill, taking the screen off. These troopers noticed that the window was open halfway from the bottom, that Marvin was leaning on the window sill on his arms, with his head resting on the same and quite motionless. Cox was trying to get hold of him to help him out of the window, but couldn’t do so. Garrett went back into the house, and he and another trooper rushed the door but succeeded in getting it open only five or six inches. A breeze was blowing through the window spreading the misty gas fumes, the irritating effect and malodorous fumes forcing the troopers out in two or three minutes. The troopers affected would run *906 out on the porch to be replaced by other troopers. In a few minutes, Corporal Cox and Norman reached in and removed the piece of furniture which had been barricading the door. They both gained entry into the room and helped Marvin to his feet. Keating gained access at about the same time through the window, and found a fish knife on the table in the room. When Marvin was taken out of the room, he was stark naked. He was placed upon a waiting stretcher, covered with a blanket and taken to the hospital. At the time of his removal from the room, Marvin was suffering, and at times gave out agonizing cries and at other times he moaned. This continued in the ambulance. In the ambulance, he vomited and frothed at the mouth, his eyes teared and he made screeching sounds. The experts testified that the decedent was undoubtedly suffering excruciating pains from the irritating effects of the gas upon his lungs and respiratory tract. The claimant’s experts also explained that at first clothing is a protective shield against the gas but that when clothing becomes impregnated with gas it then is a constant irritant against the skin, which accounted for the shedding of all his clothes by the decedent.
The trip to the hospital took approximately from 10 to 15 minutes. He was received at the emergency room of the hospital at 2:15 p.m. At 3:30 p.m. he was received as a patient in the Mosher Memorial, the psychiatric section of Albany Hospital, merely upon the history furnished by the troopers and not as a result of medical findings. Upon the history received, Marvin was diagnosed as a schizophrenic paranoid. On October 8,1958, at 4 -.40 a.m., some 14 hours after the throwing of the gas canister, Marvin died.
The intern who first treated him at the hospital testified that deceased screamed from the time of his arrival until he was brought into the emergency room; that the odor of tear gas was so strong that the doctor could not stay in the room for more than two or three minutes; that while under observation for one-half hour, he was agitated, cried and screamed, being conscious throughout that time; that the intern administered 750 milligrams of sodium amytal to limit his pains, which seemed to have no effect on him.
The resident intern in psychiatry testified that the decedent continued moaning and was given more sedation.
The pathologist who performed the autopsy stated that his lips and face and the upper part of the chest were bluish, indicating a lack of oxygen. When the body was opened, it was found that virtually the entire respiratory tract showed lf destruction of the living cells, covering by an exudate, a pussy *907 exudate and the lungs themselves weighed approximately three or four times normal * * * the remainder of the findings were essentially those of anoxia. That is shortness, inadequate oxygen supply as seen by small little hemorrhages in many of the organs.”
Marvin was 29 years of age, had graduated from grammar school and had completed one month of high school. From the time he had left high school, he delivered daily and Sunday newspapers. For a period of two to three years prior to his death, his income therefrom was approximately $460 per year. He did not make direct financial contributions to his mother, but bought groceries and did odd jobs about the house.
Charles T. Male, professor of civil engineering at Union College, testified that he made a floor plan of the house in question. The bedroom of Marvin was 9 feet by 9 feet and 8 feet 6 inches high and in all contained 700.79 cubic feet; the window was 27 inches from the floor, and measured 2 feet 8 inches by 5 feet. The door was 6% feet high.
On behalf of claimant, Dr. Morris T. Jacobs, associate professor of occupational medicine at Columbia University, and a toxicologist and a recognized expert on chemical gases who has written a widely accepted book on the use and effect of chemical gases, testified that whether or not a concentration of the gas that was used is lethal depends on space and time. Considering the open panel in the door and that the window might have been half open, he was of the opinion that within five minutes Marvin, nevertheless, would have been exposed to a lethal concentration. He asserted that this gas is heavier than air and it hovers low, and its concentration would hardly be affected by these openings which were relatively high, although its diffusion would be quickened. He stated that this type of gas canister is in general use for the control of outside crowds and is not designed to be used indoors; that while he never knew of one’s dying from the effects of tear gas, neither did he know of a case where a person was exposed to a similar concentration. He stated that the concentration of the gas applied here was seven times stronger than would be required to cause death in such space within a 10-minute period.
William H. Durno, chief chemist of Federal Laboratories, Inc., of Saltsburg, Pennsylvania, manufacturer of the tear gas canister, testified that the canister used was a 112 Spedeheat; that it is loaded with solid crystalline chloroacetophenone; that this grenade represents 30% to 40% of the total sales of the company and is used by law-enforcement agencies throughout the world; that the reason for the use of this grenade is to *908 irritate the eyes, forcing a person in a room to emerge; that the grenade is designed as a general purpose item and may he used indoors, particularly where persons have barricaded themselves into a room. He testified further that if the window was open, and the panel of the door knocked out, the gas would not be lethal, but that if the room had no ventilation, and the window were closed for 10 minutes, there could be a lethal concentration. In his 23 years of experience, he had never heard of a death being caused by this grenade. He conceded that no instruction is given with reference to the use of the grenade, other than caution against holding the grenade after its release. The label does not advise of the content, nor of what reaction may be expected of the content; no literature advises users of the method of use, although the literature of the Federal 112 grenade is listed as containing ON contents of 128 grams. This witness did not enlighten the proceedings very much, other than to give superficial information concerning the use and effect of the gas.
Dr. Milton Helpern, Chief Medical Examiner of the City of New York, testified on behalf of the State that he had knowledge of one case of death by tear gas, where the deceased had been exposed in a barricaded room for one hour and a half. He concurred with the findings that tear gas can be lethal. Normally, tear gas produces irritation of the eyes, being known as a lacrimator but the length of time of exposure and the area of distribution are a consideration in its being lethal.
Dr. McCullough, called as a witness on behalf of the claimant, testified that on the date of the occurrence herein, he was the Town Health Officer of the Town of Colonie; that he did not talk with the mother of the deceased or with Norman, his brother; that neither of them was called upon by him to sign any papers and that he never spoke with the deceased.
Dr. Stein, who performed the autopsy on Marvin, testified that exposure to the gas was the competent producing cause of his death.
Norman Titcomb, brother of the deceased, testified that when the State trooper suggested the name of Dr. McCullough, he was unaware that he was the county doctor, and thought he would be called to treat Marvin only; that when Marvin was taken to the hospital, he did not know where he was being taken, but received a call from Albany Hospital about 2:45 p.m. and went there; that when the trooper had suggested a doctor he had agreed because he thought Marvin might have a cold or fever. He further testified that he secured a .410 shotgun which he himself had in a room in the floor above and put it in the trunk of his car. He denied that he was consulted as to the *909 use of gas, and stated that the first he knew of its use was when he saw7 mist. As to a statement signed by him to the effect that the lieutenant spoke to him about the use of tear gas, and that he spoke to a trooper about his brother being depressed, he testified at the trial that at the time he read the long statement only in parts, and that it is not true that the police spoke to him about the use of tear gas.
Testimony by the State troopers indicated that a course of instruction for troopers is held at Troy, New York. Among other things, tear gas is one of the subjects of instruction. They are shown two types of tear gas, one of which, the projectile type, is shot from a gun. This type is usually less than one ounce in weight. The testimony of one of the experts indicates that police generally use the projectile type of bomb to dislodge people from an enclosure. The other is the canister type which was used by the police here. As to this, the tear gas classes were held in the incinerator of the City of Troy. Ten or fifteen men at a time go into a shed. One of the canisters is released in the building the cubic content of which was not disclosed. The men enter with gas masks. In the building the masks are removed, the men remain a few minutes and then leave the building. The troopers stated that the only effect felt is irritation of the eyes. At the State Police Training School the men were told that tear gas was not a lethal weapon. They also testified that the only grenade issued for use to State police other than the projectile is the one which was used here.
In order to arrive at a decision herein, the court must consider whether under all of the circumstances the use of tear gas by the State police was justified and whether in its use proper procedure was followed.
When the police went to the Titcomb residence, as a result of the complaints of the broken "windshields, their purpose was investigation. No warrant had been issued for the arrest of the decedent for a crime, nor did the police have any information whatever which would tend to connect Marvin with the broken windshields. No justification for an arrest existed under section 177 of the Code of Criminal Procedure which would have authorized an arrest without a warrant.
Originally the purpose of talking to the decedent was to question him about the complaints which had been made. The situation with which they were confronted when they entered the Titcomb premises was that a man was found to be on the premises who was upset over the loss of his mother’s home by reason of the Northway construction and because he had recently lost his newspaper delivery route, He had taken to locking *910 himself in his room, refusing to have his hair cut or to shave. He had become a virtual recluse, apparently because of the occurrence of these events.
Before the door was partially broken down, he had offered no resistance, had exhibited no dangerous propensities. He had merely expressed his intention of not coming out of Ms room.
The police then abandoned their idea of talking to him about the windshields and became concerned with his mental condition. The court cannot agree that the decedent’s action up to this time gave the police reason to conclude that he was mentally incompetent. The fact that one varies from the majority of men in that he does not have his hair cut or shave is no indication in and of itself that he is not sane, nor does the fact that he keeps to his own room and refuses to talk justify an inference that he must therefore be incompetent. Yet Trooper Garrett summarily decided that the decedent was mentally incompetent, and by his testimony attempted to make arrangements to have Mm examined and committed; he did not set forth as a premise for the commitment a finding by a competent authority that the decedent actually was incompetent.
Whatever Marvin did by way of throwing implements out of his room in the direction of those who were attempting to break into it constituted legal resistance to attempted illegal entry into his room. (Penal Law, § 246, subd. 3; People v. Cherry, 307 N. Y. 308; Code Crim. Pro., § 177; N. Y. Const., art. I, § 12.)
The police lieutenant testified that decedent has committed two second degree assaults on men of his command, and that he was acting in a manner that was not considered ‘ ‘ normal in a sane human being; so either way, he was being taken into custody. If he came out and acted normal, we would have him arrested for second degree assault.” This was illogical reasoning, because decedent had not committed an assault and it was not for the police to decide if he was competent. Nor does it constitute proper police procedure, because what he proposed to do was to take decedent into custody and then to determine whether he was to be charged with assault or to be committed. (Snead v. Bonnoil, 49 App. Div. 330, affd. 166 N. Y. 325.)
Although on the question of mental incompetence the activities of the police were later directed toward securing medical attention for deceased, there was no compliance with statutory procedure.
The Mental Hygiene Law prescribes commitment procedure for a person alleged to be mentally ill. Section 72 provides for *911 admission on the certificate of the appropriate health officer. This must be based upon a personal examination by such officer. Here Dr. McCullough made no personal examination of decedent, nor did he even talk to him. Section 73, dealing with admission on the certificate of one physician, section 73-a, with admission on the certificate of two physicians, and section 74 with admission on court certificate, are inapplicable because there was no attempt at compliance therewith. Section 75 provides for commitment if he is so dangerous by virtue of his mental condition as to render it necessary for public safety that he be immediately confined. There was no such emergency in the present case, as no action on the part of the deceased had indicated that he was dangerous. There was no showing that decedent was so dangerous that resort to the extraordinary measure of summary restraint was necessary for his own and the public’s safety. The procedure adopted in attempting to apprehend decedent had no justification in common law or in statute. (Warner v. State of New York, 297 N. Y. 395.) The court concludes that the use of tear gas by the troopers was not justified.
Further, even assuming that under the circumstances the use of tear gas was justified, the court finds that the State was negligent in failing to instruct the officers that the tear gas could be lethal. Where an employer entrusts his employees with an instrumentality; intending him to use it, the employee must be trained sufficiently in its use to avoid causing harm to another. The State had the duty of giving its troopers proper instruction in the use of tear gas, to enable .them to use the same properly and safely in a reasonably foreseeable situation. (Meistinsky v. City of New York, 285 App. Div. 1153, affd. 309 N. Y. 998.) This the State failed to do, informing the troopers that tear gas was not a lethal weapon when in fact, under some conditions, it could be lethal. It was reasonably foreseeable that failure of the State properly to instruct the State troopers as to the lethal qualities of the gas, and failure to teach the proper methods of employing the device so as to avoid a fatal effect might result in a fatality as a result of the use of the gas. From the expert testimony offered on the trial the court is satisfied that the lethal effect of the tear gas would be the predictable result under the circumstances herein.
The failure of the police to bring tear gas masks with them was negligence. Lieutenant Dwyer testified that it was not the general practice to take gas masks along, that he had never used tear gas except in exercises and institutions. He testified that when he and another trooper tried to force open the door, their eyes began to bother them, causing them to desist in their *912 efforts to force open the door. He then made a rush trip for masks to the fire department station some miles away. Consequently, it is" clear that if the gas masks had been brought originally, the time of exposure to the gas would have been less, perhaps enough to have saved Marvin’s life.
• The court feels that in attempting to apprehend the decedent, the State troopers acted in accordance with their concept of what constituted their duty, although they were perhaps overzealous therein. The record indicates abundantly that they were the unwitting victims of their own good intentions to help this hapless family. Their warm hearts clouded their duty to respect the inviolability of the victim’s room, his home. So far as the use of the tear gas is concerned, they also acted in line with the instructions they had received directly from the State, and were unaware that the tear gas could be lethal. The State, however, was remiss in failing to instruct the troopers of the potential danger involved in the use of the gas. The proximate cause of the death of the decedent was the negligence of the State, and the deceased was not guilty of contributory negligence.
The court awards claimant the sum of $5,000 for her pecuniary loss, .the sum of $760 for funeral expenses and the sum of $52 for medical expenses, making a total award of $5,812, with interest thereon as allowed by law. (Decedent Estate Law, § 132.) No award is made for exemplary damages (Nephew v. State of New York, 178 Misc. 824), or for trespass, but an award is made by separate decision for conscious pain and suffering.
All motions heretofore made by the State on which decision was reserved are hereby denied.
After trial, the court awards the claimant administratrix the sum of $20,000 for the conscious pain and suffering of decedent.