[Civ. No. 16839. Fourth Dist., Div. One. Sept. 18, 1978.]

Estate of JAMES LINWOOD COLLINS, Deceased.
ALICE L. KOHLER, Plaintiff and Appellant, v.
JAMES L. KINTZ, as Administrator, etc., Defendant and Respondent.

930

**COUNSEL**

Smith & Peltzer and Thomas W. Smith III for Plaintiff and Appellant.

James L. Kintz, in pro. per., for Defendant and Respondent.

## OPINION

**COLOGNE, Acting P. J.**—Petitioner Alice L. Kohler brought a proceeding under Probate Code section 851.5 to determine title to funds totaling over $26,500 on deposit at Home Federal Savings and Loan Association (Home Federal) in an account standing in the name James Linwood Collins. Kohler appeals the court's order denying the petition and decreeing the funds are an asset of Collins' probate estate.

The hearing on the petition was conducted on stipulated facts. Collins went to the Central Federal Savings and Loan Association (Central Federal) office in Carlsbad on October 11, 1976, and signed an application for individual trustee savings deposit account naming himself as trustee and Kohler as beneficiary of the funds remaining in the account at his death. Collins also signed and delivered to Central Federal a sight draft directing Home Federal to pay the balance of his account No. 019-034153-7, $26,597.62 plus accrued interest, to Central Federal for credit to the trustee savings account. At the same time Collins also delivered to Central Federal his passbook which evidenced his ownership of the Home Federal account. Collins had no funds on deposit at Central Federal at that time and made no deposits. Central Federal prepared a passbook but made no entry for any balance in the account.

Central Federal forwarded the sight draft and evidence of account ownership to Home Federal. On October 15, Home Federal wrote Central Federal demanding Collins' signature on the sight draft be notarized.

Collins died intestate October 15 and the Home Federal account was inventoried in his estate by the administrator, James L. Kintz. Kohler is one of three persons entitled to succeed to Collins' property.

In reaching its conclusion the court found Collins intended to create a trust of the Home Federal account balance for the benefit of Kohler, but found no such trust was in fact created.

Kohler asserts a Totten trust was created without a transfer of the funds, claiming Collins made a declaration of trust and adequately designated the trustees and beneficiary simply leaving to be done a ministerial transfer of funds to the designated depositary which is only coincidental to the trust creation. We analyze the case before us keeping

in mind the trial court's specific finding Collins intended to create a trust. The facts clearly support such a finding.

The doctrine of "tentative trusts" created by the deposit of funds in trust for some person other than the depositor is accepted law in this state (*Brucks* v. *Home Federal S. & L. Assn.,* 36 Cal.2d 845, 849 [228 P.2d 545]; *Kuck* v. *Raftery,* 117 Cal.App. 755, 757-759 [4 P.2d 552]; *Evinger* v. *MacDougall,* 28 Cal.App.2d 175, 179 [82 P.2d 194]; *Estate of Alberts,* 38 Cal.App.2d 42, 47-48 [100 P.2d 538]; *Hyman* v. *Tarplee,* 64 Cal.App.2d 805, 812-813 [149 P.2d 453]; *Kosloskye* v. *Cis,* 70 Cal.App.2d 174, 177-180 [160 P.2d 565]; *Katz* v. *Greeninger,* 96 Cal.App.2d 245, 247-248 [215 P.2d 121]; and see Fin. Code, § 853[1]). California has, in this regard, followed the rule set out in the case of *In re Totten,* 179 N.Y. 112 [71 N.E. 748, 752]: "A deposit by one person of his own money in his own name as trustee for another, standing alone, does not establish an irrevocable trust during the lifetime of the depositor. It is a tentative trust merely, revocable at will, until the depositor dies or completes the gift in his lifetime by some unequivocal act or declaration, such as delivery of the passbook or notice to the beneficiary. In case the depositor dies before the beneficiary without revocation, or some decisive act or declaration of disaffirmance, the presumption arises that an absolute trust was created as to the balance on hand at the death of the depositor."

The issue here is whether there was in fact a *deposit* in trust for some person other than the depositor, an essential ingredient to the creation of a "tentative" or "Totten" trust (see *Brucks* v. *Home Federal S. & L. Assn., supra,* 36 Cal.2d 845, 849-850; and see 1 Scott on Trusts, § 58 et seq., p. 519 et seq.).

■ In a real sense a tentative or Totten trust is not a trust at all but is a recognized exception to the law of testamentary disposition and as such obviates the necessity for compliance with the requisite statutory elements of executing a will. "The doctrine is an anomalous fiction evolved by the courts to enable persons to dispose of small sums of money without testamentary formalities and expense." (Note (1940) 28 Cal.L.

---

[1]Financial Code section 853 provides: "Whenever any *deposit* is made in a bank by any person which in form is in trust for another, but no other or further notice of the existence and terms of a legal and valid trust is given in writing to the bank, in the event of the death of the trustee, the deposit or any part thereof may be paid to the person for whom the deposit was made, whether or not such person is a minor." (Italics added; see also Rest.2d Trusts, § 58.)

Rev. 202; see also Annot., Trust in Individual Bank Deposit, 38 A.L.R.2d 1243, 1283.) "It is clear that a similar trust of property other than savings bank deposits would be invalid." (Scott, *Trusts & the Statute of Wills,* 43 Harv.L.Rev. 521, 543.) Under these circumstances we are compelled to confine its application to the limited area where its application is authorized.

■ A "depositor" is one who pays money into a bank in the usual course of business, to be placed to his credit (*Merchants Nat. Bk.* v. *Continental Nat. Bk.,* 98 Cal.App. 523, 530 [277 P. 354]). The relation of the bank and the depositor is that of debtor and creditor and is founded on contract (*Allen* v. *Bank of America,* 58 Cal.App.2d 124, 127 [136 P.2d 345]). The agreement between the parties relative to the "deposit" is thus significant. ■ Generally speaking, a deposit is complete when money or negotiable instruments are delivered into the possession of the bank (9 C.J.S., Banks and Banking, § 269, p. 549). Whether any particular transaction constitutes a deposit in the accepted sense of that term will depend on the intent of the parties as ascertained from the facts and circumstances disclosed (9 C.J.S., Banks and Banking, § 269, at pp. 549-550; see *Fourth Nat. Bank* v. *Wilson,* 110 Kan. 380 [204 P. 715, 719-720]; and see *First Nat. Bank* v. *Hirning,* 48 S.D. 417 [204 N.W. 901, 904]).

■ The parties here stipulated there was no "deposit" into the Central Federal savings account and the court made a finding no trust was created in favor of Kohler. Substantial evidence supports that position. We note the passbook to the savings account and the executed sight draft were handed to Central Federal for the purpose of opening an account in Collins' name as trustee. No credit was made to the new account at that time and while the actual entry of a credit may not be essential to the creation of a "deposit" (see *Duggan* v. *Hopkins,* 147 Cal.App.2d 67, 70-71 [304 P.2d 823]), the absence of a credit does evidence the agreement of the parties no deposit was intended at that time. Presentation of the passbook and acceptance of the sight draft by Home Federal were necessary to complete the collection process and to effect the deposit. It was apparent Central Federal was unwilling to acknowledge a deposit at the time Collins handed over the signed documents, or to assume the debtor-creditor relationship with Collins until the collection was complete; similarly, Collins was well informed by reason of the zero balance in his new passbook no "deposit" had yet been effected. There was no deposit.

■ It has been suggested that by doing everything necessary to create the deposit Collins made a symbolic delivery to Central Federal and effectively created a tentative or Totten trust. Symbolic delivery has been used as a manner of consummating a gift where the donor desires to transfer to the donee, trustee or beneficiary the present power of dominion and control. (*White* v. *Bank of America,* 53 Cal.App.2d 831, 833 [128 P.2d 600]; *Gordon* v. *Barr,* 13 Cal.2d 596 [91 P.2d 101] [gift *causa mortis*]; *Klindera* v. *Smith,* 15 Cal.App.2d 115, 118 [59 P.2d 156] [joint tenancy bank account]; *Lawson* v. *Lowengart,* 251 Cal.App.2d 98 [59 Cal.Rptr. 186] [*inter vivos* trust].) In the tentative or Totten trust, however, the owner intends no such transfer. Nor was there an assignment in the usual sense.[2]

The formalities which the law imposes for making a testamentary disposition of property are often burdensome but are founded on good reason and a long line of historical precedent. Until that concept is altered by the Legislature we are compelled to uphold the principle that mere attempts to meet those requirements are not sufficient even when accompanied by the proper intent. Here Collins simply attempted to alter his own method of holding title to accomplish this method of testamentary disposition. His efforts were as legally unproductive as those of the individual who has his attorney prepare a will expressing his wishes but fails to sign it or signs it out of the presence of his witnesses, or the individual who writes a holographic will and fails to date it. ■ There was no trust account here, only an application to open one. Collins certainly declared his intent to make such a deposit at Central Federal and did everything required of him to effect that intent. There was no "balance on hand at the death of the depositor." (*In re Totten, supra,* 71 N.E. 748, at p. 752.) The fact remains, however, no deposit was made. Under these circumstances there was no compliance with the requirement of a deposit necessary for the creation of a tentative or Totten trust. Reaching the same result on similar facts is *Linder* v. *Richmond Hill Savings Bank,* 30 Misc.2d 839 [219 N.Y.S.2d 562].

---

[2]A check or draft does not of itself operate as an assignment of any funds in the hands of the drawee (here Home Federal) available for its payment, and the drawee is not liable on the instrument until the drawee accepts it (Cal. U. Com. Code, § 3409, subd. (1); *Holbrook* v. *Smith,* 87 Cal.App.2d 66, 73 [196 P.2d 824]; and see 2 Witkin, Summary of Cal. Law (8th ed. 1973) Negotiable Instruments, § 7, pp. 1296-1297; 10 Cal.Jur.3d, Bills and Notes, § 218, p. 225). "*Assignment* is a term which may comprehensively cover the *transfer* of title [not possession] to any kind of property." (1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 726, italics in original. See also *Commercial Discount Co.* v. *Cowen,* 18 Cal.2d 610, 614 [116 P.2d 599]; cf. *Dunlap* v. *Commercial Nat. Bank,* 50 Cal.App. 476, 480 [195 P. 688], where there was an assignment, but of title and to a third person.)

Kohler argues Collins' actions created a trust for her benefit as to the funds on deposit at Home Federal.

Essential to the creation of such a trust is the matter of intent, and this is a question of fact for the trier of facts (*Brucks* v. *Home Federal S. & L. Assn., supra,* 36 Cal.2d 845, 850; *Kosloskye* v. *Cis, supra,* 70 Cal.App.2d 174, 180-181). The issue was resolved by the trial court's finding such intent was present.

A declaration by a person he is to hold his own money in his own name "as trustee" for another creates, at most, a legal relationship which is entirely revocable at the will of the person making the declaration (see *Brucks* v. *Home Federal S. & L. Assn., supra,* 36 Cal.2d 845, 850). Where the person making that declaration reserves power not only to revoke but also to control the administration of the trust during his lifetime as he likes without restriction, the testamentary nature of the trust is most apparent (see *Randall* v. *Bank of America,* 48 Cal.App.2d 249, 252 [119 P.2d 754]). The existence of such broad reserved powers over the named property must meet the standards required of a testamentary disposition unless it is shown to be within the narrow situation of a "tentative" or "Totten" trust which we have already negated. The situation is described in this way by Scott on Trusts: "If indeed the settlor reserves power to deal with the trust property during his lifetime as he likes, the trust may be testamentary. Thus if the owner of property declares himself trustee to dispose of the property in any way he chooses as long as he lives, and provides that, if he has not otherwise disposed of the property during his lifetime, it is to be held upon his death for a designated beneficiary, the trust is testamentary and invalid unless the requirements of the Statute of Wills are complied with." (1 Scott on Trusts, § 57.6, p. 519.)

█ In this case there has been at best an ineffectual attempt to make a testamentary disposition which cannot be carried out without compliance with statutory requirements governing the making of wills (see *Noble* v. *Learned,* 153 Cal. 245, 251-252 [94 P. 1047]; see also *Cohen* v. *Meyers,* 6 Cal.App.3d 878, 880-882 [86 Cal.Rptr. 456]).

In *Noble* v. *Learned, supra,* 153 Cal. 245, the owner gave certain stock certificates to another to hold "for her." She stated she did not want to

put the property out of her control but wanted to be able to use or control them in whole or part as long as she lived, and on her death have them delivered to another. The trial court found the owner intended that any of the certificates not parted with in her lifetime should go to the other parties designated. She was, however, not transferring any present interest in the shares because she reserved full control. She was merely arranging a disposition which would take effect upon her death. The Supreme Court said: "Taking it all together, it justified the inference that, while [the owner] undoubtedly intended and desired that any of the certificates not parted with in her lifetime should go to the parties designated, she was not transferring any present interest in the shares, but was merely endeavoring to arrange a disposition of them which should take effect upon her death. Such disposition, being in effect testamentary, could not be made effective except by a will executed in accordance with the statutory requirements governing the making of wills." (*Noble* v. *Learned, supra,* 153 Cal. 245, 252.)

The existence of intent to create the trust even when combined with a declaration of trust is not alone enough to create a trust under the facts of this case. Where the powers of revocation and control during the owner's lifetime are as broad as evident here, it is apparent a testamentary disposition is intended and this cannot be effected without violating the sound policy considerations underlying the due execution requirements of formal wills (see Prob. Code, § 50; see 1 Scott on Trusts, *supra,* § 57.6, p. 518). Collins did not meet the requisites of a will and we must conclude there was no trust created.

In summary, we hold the type of trust Collins intended to create, a "tentative" or "Totten" trust, was not created because no deposit required by law was in fact accomplished. Moreover, viewing Collins' intent as directed to the creation of a type of trust other than a "tentative" or "Totten" trust, it was, in view of the after-death nature of the intended transfer and the broad powers he reserved to himself during his lifetime, an attempt to effect a testamentary disposition in violation of the statutory requirements.

Order affirmed.

Welsh, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.

**STANIFORTH, J.,** Dissenting.—The majority opinion, in my view, errs in several respects. The taproot of this errancy is the oft-repeated conclusion that a Totten trust was not created because trustor-trustee Collins "made no deposit" in Central Federal Savings and Loan Association. This conclusion is contrary to the conceded facts, contrary to decisional law of this state and universally recognized scholarly writings.

The resultant opinion violates a most fundamental rule of construction of written documents. It, without sound basis in authority or reason, refuses to enforce the crystal clear written expression of intent of decedent Collins to create a Totten trust.

### THE FACTS

We review the conceded facts in some detail to the end that law and reasoning relevant to *this* set of facts be applied. The evidence is overwhelming that James L. Collins (Collins), now deceased, intended to establish a Totten trust—a savings account trust with himself as trustor-trustee and his sister Alice L. Kohler as beneficiary in the Central Federal Savings and Loan Association of San Diego (Central Federal). He expresses this intent most specifically in writing. Six separate written documents together with the conceded act of delivery of certain documents to Central Federal form the unshakeable fact basis for the legal analysis. These documents in pertinent part are:

*Document No. 1*—Collins' signed application for individual trustee savings deposit account:

"INDIVIDUAL TRUSTEE ACCOUNT Acct. Type 01 Account No. _____

(Revocable) Soc.Sec.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

___ COLLINS: James L. (Mr.)*** Trustee

for KOHLER: Alice L. (Mrs.) (sister) (Beneficiary(ies)

Undersigned Trustee who is also the Settlor, hereby applies for an individual Trustee savings deposit account in CENTRAL FEDERAL SAVINGS

AND LOAN ASSOCIATION OF SAN DIEGO (hereinafter referred to as 'Association') and for issuance of evidence thereof in the approved form in the name of undersigned as Trustee for Beneficiary(ies), subject to the terms of the Declaration of Trust on the reverse side hereof, to which Declaration undersigned Trustee-Settlor hereby agrees and subscribes as though it were set forth in full at this point. . . .

Date 10-11-76 Tel. No. 279-8976

Signature of Trustee for
Trustee-Settlor /s/ JAMES L. COLLINS Beneficiary(ies)
 2235 Ulric Street #2, San Diego, Ca. 92111

(declaration of trust on reverse side)"

and on the reverse side is the incorporated "Declaration of Trust":

"(continued from face of card)

### DECLARATION OF TRUST

I, the person signing as Trustee and Settlor on the reverse side hereof, hereby declare that the account numbered and designated on the reverse side hereof is, and any and all sums added to such account at any time are and shall be, held by me in trust for Beneficiary(ies) designated on the reverse side hereof; reserving to myself the right to hold, manage, pledge and invest such funds in my sole discretion, and to have any earnings on such account paid to me, and to revoke such Trust in whole or in part, at any time(s), by executing and delivering to Association a request for withdrawal of the whole or a part of such account and without obligation on the part of Association to look to the application of the fund.

At my death Association may transfer or pay the withdrawal value of the account to Beneficiary if then living (if more than one person be designated as such Beneficiary, then equally to Beneficiaries living), but if no Beneficiary so named is living at the time of my death, Association shall pay such withdrawal value to my estate, free and discharge of any trust."

*Document No. 2*—Passbook Number 46—was issued in this form:

"Account
Number 46-

CENTRAL FEDERAL SAVINGS AND LOAN ASSOCIATION OF SAN DIEGO
Incorporated Under the Laws of the United States of America
90 DAY-BONUS ACCOUNT
 Date of Issuance October 11, 1976

Accountholder(s)

Mr. James L. Collins, as trustee for
Mrs. Alice L. Kohler, beneficiary (sister)

| Minimum Balance Required | Qualifying Period | Additions | Rate of Interest |
|---|---|---|---|
| $1,000.00 | 90 days | None | 5¾% per annum |

This certifies that the accountholder(s) have a savings account at Central Federal Savings and Loan Association of San Diego.

A bonus is distributable on the amount of this account as provided in, and subject to paragraph (b) of section 545.3 of the rules and regulations for the Federal Savings and Loan System for which purpose the beginning of the qualifying period of 90 days is _____.

In the event of any withdrawal from this account during the first 90 days, no interest shall be paid on the amount withdrawn.

This account will be administered in accordance with the rules established by the Board of Directors for this account classification.

By /s/ FRED C. STALDER
Fred C. Stalder—President"

(Emphasis added.)

This passbook contains no entry showing any *cash* deposited into the trust account then set up. We examine anon into the legal [in]significance of this fact.

*Document No. 3*—Collins on the same day signed as "account holder" a "revocable proxy" appointing "the Official Proxy Committee of CENTRAL FEDERAL SAVINGS AND LOAN ASSOCIATION OF SAN DIEGO, . . . to vote as proxy" at any meeting of members of the Association. Concurrent with the execution and delivery of these foregoing documents, Collins physically delivered, turned over to, deposited with Central Federal the following.

*Document No. 4*—A negotiable draft, No. 27169, directing Home Federal Savings and Loan Association (Home Federal), Seventh and Broadway, San Diego, to pay the balance in Collins' savings account #019-034153-7, $26,597.62 plus accrued interest, to Central Federal Savings and Loan Association. The draft reads as follows:

"DRAFT NO. 27169

Carlsbad , Calif. 10-11 1976

PAY TO THE
ORDER OF Central Federal Savings and Loan $26,597.62 + Int.
 Association of San Diego
BALANCE PLUS INTEREST TO DATE OF WITHDRAWAL* * * * Dollars

for value received and charge my Account No. 019-034153-7

To: The evidence issued in
 connection with this
 Home Federal Savings & Loan account is enclosed.
 Assn. Please return.
 7th and Broadway
 San Diego, California 92111 /s/ JAMES L. COLLINS
 Signature"

Accompanying this "draft" and as part of the same document was a letter of Central Federal to Home Federal stating in substance:

"Gentlemen: We have received from your account holder(s) the enclosed evidence of a savings account and the attached sight draft. At the request of your account holder(s) we are presenting these documents to you for payment.

"Please remit your check payable to our order. Also, please return the account evidence to us so that we may forward it to your account holder(s).

"Thank you.

/s/ CYNTHIA SMITH
Very truly yours,
Cynthia Smith"

*Document No. 5*—At the same time, Collins physically delivered over to Central Federal his Home Federal savings account passbook showing his ownership and amount deposited in savings account #019-034153-7. In return for the deposit of the passbook and negotiable draft, Central Federal issued its "draft receipt" to Collins in the following form.

*Document No. 6*—Draft Receipt:

"DRAFT RECEIPT

<u>Carlsbad</u> , Calif. <u>10-11</u> 19<u> </u>

This acknowledges receipt by Central
Federal Savings and Loan Association
of a passbook, or other account
evidence, for the institution agreed
below and a sight draft for <u>$26,597.62 + Int.</u>

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*Dollars

in connection with Account No. <u>019-034153-7</u>

To Home Federal Savings & Loan Assn. FROM
7th and Broadway
San Diego, California 92111 /s/JAMES L. COLLINS

James L. Collins

<u>Funds earn from October 11, 1976</u>
<u>Our Account # new a/c</u>

Instructions:
 5.75% Bonus 90 day

CENTRAL FEDERAL SAVINGS

by: /s/ C. SMITH
 C. Smith"

(Emphasis added.)

The foregoing evidence leads unmistakably to one conclusion: not only did Collins execute a clear, explicit written declaration creating a Totten trust, but he physically delivered a negotiable document—a draft, together with his passbook—evidence of title to the savings account funds at Home Federal, together with express authority to Central Federal to use the documents to reduce the deposited negotiable instrument and passbook to cash. Further, and of significance, Central Federal upon its receipt of these two documents *agreed that "Funds earn from October 11, 1976,"* and that a "bonus" 5.75 percent was "distributable" 90 days from October 11.

Thus the precise question presented on these facts is not whether there was in fact a deposit made and acknowledged on the part of the depository bank—there was in fact a physical deposit of a savings account passbook and a negotiable document—, but whether the law requires a *cash* deposit before a Totten trust becomes operative.

In general usage the term "deposit," when used in connection with a banking transaction, denotes a contractual relationship resulting from the delivery, by one known as the "depositor," of monies, funds, or things into the possession of the bank, which receives the same upon the agreement to pay, repay, or return, upon the order or demand of the depositor, the monies, funds, or equivalent amount, or things, received. (10 Am.Jur.2d, Banks, § 337, p. 299; 7 C.J., p. 637, and cases cited in notes 44, 47.) See *City of Lincoln* v. *First Nat. Bank,* 146 Neb. 221 [19 N.W.2d 156, 158] and *In re Liquidation of Columbus State Bank,* 95 Mont. 332 [26 P.2d 643, 644].

 Michie on Banks and Banking (1973), chapter 9, section 3, page 19, states:

"And banking practice generally has given the term 'deposits' a meaning much broader than that given it by the Uniform Disposition of

Unclaimed Property Act. [*Bank of America* v. *Cranston,* 252 Cal.App.2d 208, 218.] In transactions between banks and individuals or other banks, the word 'deposit' must be restricted in its meaning to the sense in which it is ordinarily used in such business. As so used it means the placing of money, checks, and the like with a bank. When that is done, the bank receiving such funds is a depositary, and the fund is a deposit.

" 'A depositor is one who delivers to or leaves with a bank money, or checks or drafts, the commercial equivalent of money, and by virtue of which action the title to the money passes to the bank.' " (9 C.J.S., Banks and Banking, § 267, p. 544, fn. 11, and cases cited.)

"Generally speaking, a deposit is complete when money or negotiable instruments are delivered into the possession of the bank, or its agent, . . ." (9 C.J.S., Banks and Banking, § 269, p. 549; and cases cited.)

Nor is it of any consequence that credit had not actually been extended on the books of the bank at the time it closed. The depositor relationship is not delayed in its creation until the time when actual entry of the deposit is made in a ledger. (*Duggan* v. *Hopkins,* 147 Cal.App.2d 67, 71 [304 P.2d 823].) "A deposit is complete so as to establish the relationship of debtor and creditor between the bank and the depositor where, as here, money or negotiable instruments are delivered into the possession of the bank with the understanding that credit will be given therefor, even though there has been no actual entry of credit on the books of the bank. [Citations.]" (*In re Liquidation of Columbus State Bank, supra,* at p. 644.)

From these authorities the conclusion follows: that cash was not deposited is not legally significant. The legal framework underlying a deposit is the creation of the contractual relationship between the depositor and depositee bank of a creditor-debtor.

In *Federal Deposit Ins. Corporation* v. *Deaton,* 105 F.2d 677, 679, it was held that a deposit of a negotiable time certificate was in fact a deposit covered by federal deposit insurance; and *Federal Deposit Insurance Corp.* v. *Irving Trust Co.,* 137 F.Supp. 145, 163, which involved the question of whether a commercial letter of credit was an assessable deposit; *In re Estate of Baxter* Ill.App.3d 92 [291 N.E.2d 851] held that a certificate of deposit is a deposit.[1]

---

[1] It seems almost a carrying of coals to Newcastle, to require citation of authority to document the premise that a deposit is made by the transference into the possession of a bank of negotiable documents. A 30-second observation at any bank, savings or

Is a "deposit" of a res of some sort necessary to the creation of a Totten trust? The answer is yes. According to Bogert on Trusts and Trustees (2d ed. 1965) section 148, page 54, the transfer of a trust res is not as a general principle an essential act to the creation of a trust. "But transfer of possession is not vital to the origin of the trust from the point of view of the law of trusts." (Accord: Civ. Code, §§ 2221, 2222.)

However, when Bogert speaks specifically of the specie of trust here under consideration at section 148, page 55, he says: "In the creation of trusts where a gift is involved or a chose in action is the subject-matter, the transfer of possession to the trustee may therefore be a condition precedent to the beginning of the trust, not because a trust always requires original and continued possession in the trustee, but because the particular kind of a conveyance which is used in this type of trust creation has as one of its elements a change in possession." 1 Scott on Trusts (3d ed.) section 32.2, page 268, relates: "We think the rule is well settled that a voluntary trust is an equitable gift, and like a legal gift *inter vivos* must be complete. Since delivery is essential to the consummation of a gift, it follows that, whenever the donor undertakes to divest himself of the entire ownership, either by direct transfer to the donee or conveyance to the trustees to hold for the donee's benefit, the transaction will not be complete unless there is actual delivery of the thing given or of the instrument by which the donor signifies his intention of parting with the control of it." The scholarly premises are in accord with California decisional law. In *Lawson* v. *Lowengart,* 251 Cal.App.2d 98, 110 [59 Cal.Rptr. 186], it was said, "The actual or symbolic delivery of the securities was essential to complete the *inter vivos* trust." (See also *Beebe* v. *Coffin,* 153 Cal. 174, 177-178 [94 P. 766].)

Within this definitional framework, the nature of the deposit here made must be examined. Two documents were physically delivered to Central Federal by Collins. "Draft No. 27169" is an unconditional order to pay a sum certain (or determinable) to a named beneficiary, Central Federal, and signed by the drawer Collins and directed to Home Federal as drawee. This is technically a draft in that it is an order as distinguished from a promise to pay. It is a negotiable document in that it contains all of the requisite elements of negotiability including the "magic words of negotiability—pay to the order of" the named payee.

---

commercial, on any day leads to an unqualified conclusion that the bulk of the deposits made in banks are not cash but negotiable documents.

This document, albeit a draft, is technically a check and is not governed in all respects by the rules governing drafts. Drafts as a species of negotiable document encompasses a broad spectrum of documents of which checks are but one. The rules governing such a draft are those applicable to principal and agent, depositor and depositee overlaid upon the rules relating generally to drafts. Checks for example do not generally perform the traditional "draft" function as a means of securing or compelling payment as part of a merchandise sales transaction. There is no requirement for the validity of the check vis-à-vis the drawer or maker that the depository bank must first "accept" the draft before an obligation to pay rises. Acceptance—certification—is required only to give rise to an obligation to the payee. The drawee bank is obligated to pay the check in accordance with its principal's direction. Therefore there was no requirement in the law that this "draft" be accepted by Home Federal before it became Collins' effective direction to pay. (*Marble Co.* v. *Merchants' Nat. Bk.*, 15 Cal.App. 347, 349, 350 [115 P. 59].)

And finally while the Uniform Commercial Code section 3409 subdivision (1) provides that a check does not operate as an assignment of any part of the funds held to the credit of the drawer unless it certifies (accepts) the check, yet it has been held that a check for a balance remaining in an account may constitute as between the drawer and the payee an *equitable assignment* of that balance where this is the intention of the parties. As was said in *Dunlap* v. *Commercial Nat. Bank*, 50 Cal.App. 476, 480 [195 P. 688]: "A lengthy argument is made on the effect of that provision of the uniform negotiable instruments law embodied in section 3265e of the Civil Code (as added by Stats. 1917, p. 1559) [now § 3409 Cal. U. Com. Code], which provides that a check of itself does not operate as an assignment of any part of the funds to the credit of the drawer and the bank is not liable to the holder unless and until it accepts or certifies the check. The provisions of the section are in accord with the law of this state prior to the adoption of the present negotiable instruments law. [Citation.] These rules concerning negotiable instruments standing alone do not militate against the doctrine of equitable assignments of specific property accompanied either by the delivery of a check or evidence in whole or in part by other means. All parties to this appeal agree that the relationship of the bank to the drawer of the check was that of debtor and creditor. Despite the effect of the code section on the rights of the bank, if from the entire transaction between Kenton and Miss Dunn it clearly appeared that it was their intention to pass title to the chose in action, then as between Miss Dunn and Kenton there was an assignment of the debt of the bank. [Citation.]"

If Mr. Collins had given only the negotiable draft (check) to Central Federal, this discussion of the rights of Central Federal arising out of the October 11 documents would end on this uncertain note.

However, there is more. Collins delivered, handed over, gave, deposited his Home Federal savings account passbook to Central Federal as part of this transaction. This coupled with the draft—a written unconditional order to Home Federal to pay Central Federal the total deposit, together with interest—constituted in law an assignment to Central Federal of the Home Federal account.

■ Michie on Banks and Banking (1971), chapter 16, section 19, page 62, leaves not the slightest doubt as to the legal effect of Collins' writings and acts: "[T]he transfer of a passbook and the giving of an order for a bank to pay the amount of a deposit on production of the book are a valid assignment, and import a consideration. Moreover a parol transfer of a savings account of which the bank has notice, accompanied by delivery of the passbook for a valuable consideration, is sufficient to pass title to the transferee."

*Watson v. Stockton Morris Plan Co.,* 34 Cal.App.2d 393, 405 [93 P.2d 855], reaches the same conclusions, stating: " 'A savings account being a chose in action may be assigned with or without a delivery of the pass book though such assignment is best evidenced by a delivery of the pass book together with a formal written assignment of the account. [Citation.] That is exactly what was done in the present case. The assignment of the account carries with it, and confers upon the assignee, all the remedies which the assignor possessed, including the right to sue the bank for a misappropriation of the funds. [Citations.] . . .' "

And as was said in *Spellacy v. Dauterman,* 122 Cal.App. 416, 419-420 [10 P.2d 114]: "In addition it may be said that the facts would have supported the conclusion that the giving of the order and the transfer of the pass-book were intended as a complete assignment of the whole deposit. [Citation.] [¶] . . . it is the rule that a check of itself does not operate as an assignment of any part of the fund to the credit of the drawer with the bank [citation], and that the drawee's authority to pay it is revoked by the drawer's death before payment or acceptance. [Citation.] In the case at bar, however, the deposit was a savings account, and the order read as follows: 'San Mateo, California, June 16, 1928.—The Hibernia Savings and Loan Society, San Francisco, Calif. Gentlemen: You are hereby directed to pay to W. L. Dauterman the

balance due me on deposit in the name of Mary E. Havens in account No. 327/397. The passbook accompanies this authorization.—Yours truly, Mary E. Havens.' In such cases there appears to be a well-settled difference in the effect of the death of the drawer of a check and that of the donor of a savings account. As stated in 28 Cor.Jur., Gifts, section 65, page 665, 'A deposit in a savings bank may be the subject of a gift, and where the owner of such deposit, with the intention of making a gift, delivers his deposit book containing entries of deposit in his name to the intended donee, with an order for the payment of the whole deposit, this constitutes a complete and valid gift thereof, although the book and order are not presented to the bank until after the donor's death.' The same rule was followed in *Allen v. Smith,* 38 Cal.App. 409 [176 Pac. 365], *Delepiana v. Hynes,* 83 Cal.App. 604 [257 Pac. 180], and *Donovan v. Hibernia Sav. & Loan Soc.,* 90 Cal.App. 489. . . ."

The leading case in the country discussing assignment of savings accounts is *Ornbaun v. First Nat. Bk.,* 215 Cal. 72, 76-77 [8 P.2d 470, 81 A.L.R. 1146], where the Supreme Court stated: "In the first place it is clear that a bank deposit of the nature of the one here in dispute is a chose in action as defined by section 953 of the Civil Code. [Citation.] The only way this chose in action could be transferred by the owner, by gift or otherwise, is by an assignment. If the deceased had assigned the chose in action prior to his death to a third person, such assignee, in order to perfect his rights as against the debtor bank, must notify the debtor of the assignment. This is so because the debtor is entitled to set up against the assignee all set-offs and defenses it may have or acquire against the assignor until he is notified of the assignment. [Citation.]"

And it was said in *Estate of Webb,* 241 Cal.App.2d 85, 91 [50 Cal.Rptr. 397]: ". . . that a savings account is merely a chose in action; that the only way such a chose in action can be transferred by the owner is by assignment, and that the assignee, in order to perfect his rights as against the debtor bank, must notify the bank of the assignment. [Citations.]"

Michie on Banks and Banking, *supra,* chapter 16, section 19, page 62, is in accord: "A savings bank deposit can be transferred by its owner only by an assignment, and the assignee must notify the bank of the assignment to perfect his right against the bank."

The Supreme Court in *Ornbaun v. First Nat. Bk., supra,* 215 Cal. 72, 77, held the rule applicable to the assignment of an ordinary nonnegotiable chose in action—notice to the debtor in order to perfect the assignee's

title against the obligor (Home Federal)—should apply "to instruments such as savings account passbooks." It is uncontradicted that notice was given to Home Federal of the assignment before the death of the assignor; therefore, no issue of notice to perfect the assignment is here present.

One further fact must be added to this legal labyrinth before drawing any conclusions. Central Federal agreed to pay Collins interest—and a bonus interest—on his deposit *from the date of the agreement, October 11.* Collins also received the perquisites of account holdership in Central Federal. In short, Central Federal gave consideration for the assignment of the savings account in Home Federal. This assignment was not upon a gift. This transaction between Collins, assignor; Central Federal, assignee; and Home Federal, obligor, was a pure banking, a commercial transaction—it resulted in a debtor-creditor relationship between Collins and Central Federal. Whether the monies subject to this assignment were to be deposited in a Totten trust or a trust for tots was of no legal relevance to the fact of assignment. That Collins contemplated a species of gift by way of a Totten trust to Kohler does not in any way hinder or thwart the legal mechanism of assignment—rights, duties—relationship created by the documents signed, acts done by these parties.

In sum, what occurred here was two separate and distinct legal transactions arising simultaneously from the same conceded facts; one involves a purely banking transaction, an assignment governed by the rules of contract, negotiable instruments and banking law; and the second legal event involved the setting up of a Totten trust, governed by the law of trusts.

The foregoing authorities lead unerringly to the conclusion that Collins assigned his Home Federal Savings account to Central Federal. Moreover the assignment carried with it the authority to enforce, to collect the chose in action. The test of the efficacy of a written instrument as a symbolic delivery of the chose in action giving rise to the trust is whether "the instrument is one upon which delivery of the trust corpus might be compelled." (*Lawson* v. *Lowengart, supra,* 251 Cal.App.2d 98, 110, and cases cited; *Lefrooth* v. *Prentice,* 202 Cal. 215, 224 [259 P. 947].)

As was stated in *Lawson* v. *Lowengart, supra,* 251 Cal.App.2d 98, at page 110:

"Defendants refer to cases indicating that the delivery requirement is *more strictly applied in relation to outright gifts* than to trusts. They cite *Francoeur v. Beatty,* 170 Cal. 740 . . . as authority for the sufficiency of the delivery in this case. . . .

"*The actual or symbolic delivery of the securities was essential to complete the inter vivos trust. A delivery by instrument must have the intended effect of divesting the donor of all present control and vesting the trustees with an equitable present right to reduce the fund into possession* [citation]. A delivery may be symbolic, such as delivery of a written instrument, without physical delivery of the securities themselves, *so long as the instrument is one upon which delivery of the trust corpus might be compelled* [citations]." (Italics added.)

A legion of cases[2] authorize an action to enforce an assignment, according to its terms against the obligor.

The incomparable Cardozo succinctly stated the rule authorizing enforcement of an assignment of a savings bank deposit account: "One of the incidents of such ownership is the right to collect the chose in action, and thus reduce it to possession. We see no reason to believe that this right is less available against savings banks than it is against other debtors. By-law and statute must speak more clearly before ownership will be shown of one of its important incidents." (*Scheffer* v. *Erie County Sav. Bank,* 229 N.Y. 50 [127 N.E. 474].) (Accord, see *Watson* v. *Stockton Morris Plan Co., supra,* 34 Cal.App.2d 393, 405; *Winchester* v. *Howard,* 136 Cal. 432, 445-446 [64 P. 692, 69 P. 77].) I conclude the documents given to Central Federal, are those "upon which delivery of the trust corpus might be compelled." (*Lawson* v. *Lowengart, supra,* 251 Cal.App.2d 98, at p. 110.)

Few references have been made to the specifics of the majority opinion. This dissent in declaratory form joins the issues. However, some direct response is warranted.

The majority relies upon the premise that in some fashion a Totten trust is violative of the statute of wills, therefore is suspect, to be frowned upon. Such reasoning may have been most apt before the matter of *In re Totten,* 179 N.Y. 112 [71 N.E. 748] was decided in 1904. A small minority of courts in the United States courts still hold such a trust invalid on the

[2]Since *Redfield* v. *Hillhouse* (Super. Ct. of Conn. (1774) 1 Root 63), the right of the assignee to compel payment by the obligor was recognized.

grounds that they are in substance a testamentary disposition. (See 1 Scott on Trusts, *supra,* p. 532.) But such is not the rule in California, for our decisions mirror the views expressed in the Restatement Second of Trusts, section 58, at pages 156-157: "*Validity of tentative trust.* In spite of the fact that in creating a Totten trust the settlor reserves practically complete control over the deposit as long as he lives, the disposition is not invalid as a testamentary disposition. The courts have upheld these trusts as a convenient method of disposing of money, and have held that the disposition is valid even though there is no compliance with the requirements of the Statute of Wills."

Totten or tentative trusts have long been accepted, regarded as valid, in this state. (*Brucks* v. *Home Federal S. & L. Assn.,* 36 Cal.2d 845, 849-850 [228 P.2d 545]; *Roberts* v. *Goetz,* 5 Cal.App.3d 364, 368 [85 Cal.Rptr. 84].)

Lack of compliance with the statute of wills is a no-weight argument against a savings account trust in California.

The majority cites the New York case of *Linder* v. *Richmond Hills Savings Bank,* 30 Misc.2d 910 [219 N.Y.S.2d 562], as applicable and persuasive authority here. *Linder* illustrates in an oblique way the correctness of this dissent. In *Linder,* the New York court said: "The two cards purporting to create a Totten trust in plaintiff's favor were never presented to and filed with the defendant bank prior to the death of depositor. Consequently, the bank could not have accepted and credited the account in the form proposed by the depositor prior to her death. Her unilateral conduct, therefore, was wholly ineffective since the bank was not a party to her plan." (*Id.,* at p. 565.) Here there were no unilateral acts of Collins but a completely executed trust agreement with delivery of documents essential to and authorizing the securing of possession of the corpus of the trust. Thus *Linder* is not in point.

One final matter needs comment. As pointed out in *Brucks* v. *Home Federal S. & L. Assn., supra,* 36 Cal.2d 845 at page 850 in discussing the essential characteristics of a Totten trust: "The determinative consideration is the matter of the intent of the depositor, and 'this is a question of fact for the trier of the facts.' [Citations.]" The "sentiments" of the depositor are touchstone of judicial duty. Here the evidence of Collins' intent to establish a Totten trust is uncontradicted, overwhelming. Further, Collins' intent to execute documents of assignment and to assign the Home Federal savings account to Central Federal is equally overwhelming. This intent was coupled with the essential acts, the

delivery of the documents of assignment to the assignee, thus fulfilling the legal requirements for a completed assignment. Further, that Collins intended Kohler to be the beneficiary of a Totten trust and intentionally executed all the documents necessary and performed all the acts required to accomplish that intent are not in dispute. Central Federal in response to these acts and deed in rights of Collins issued a passbook in his and the beneficiary's name, accepted a deposit of a negotiable document and passbook—the documents of assignment—and acknowledged its obligation to Collins by the signing of a document agreeing to pay interest and bonus interest on his deposit from the date of the signing, to-wit: October 11.

A host of cases direct us to ascertain, then honor, give effect to the intent of the maker(s) of a written instrument. Here Mr. Collins most explicitly expressed his intent ˙to make his sister, Mrs. Kohler, the beneficiary of the savings account. A court should only deny or thwart such intent upon a basis of clear law, of commanding decision, for to do otherwise would give rise to a profound injustice. None such authorization appears here. On the contrary, authorities, decisional law and sound reason require the honoring of Mr. Collins' directions.

"When the clear intention of the donor to make a gift can be carried out without doing violence to the established principles of law the courts should not seek highly technical reasons for defeating the gift." (*White* v. *Bank of America,* 53 Cal.App.2d 831, 833-834 [128 P.2d 600].)

I would reverse the judgment with directions to enter judgment in favor of Alice L. Kohler.